2011 Ark. App. 261

**Jacee DUVALL & Jeremy Dollar, Appellants**

v.

**ARKANSAS DEPARTMENT OF HUMAN SERVICES & Minor Child, Appellees.**

No. CA 10–1252.

Court of Appeals of Arkansas.

April 6, 2011.

Deborah Ruth Sallings, Little Rock, for appellants.

DAVID M. GLOVER, Judge.

Appellants, Jacee Duvall and Jeremy "Dow" Dollar, appeal the adjudication of dependency-neglect with respect to their son, E.D., born December 2, 2009. Pursuant to *Linker–Flores v. Arkansas Department of Human Services*, 359 Ark. 131, 194 S.W.3d 739 (2004), and Arkansas Supreme Court Rule 6–9(i),[1] Duvall and Dollar's attorney has filed a no-merit brief asserting that there are no issues that would support a meritorious appeal and requesting to be relieved as counsel. The clerk of this court provided Duvall and Dollar with copies of counsel's motion and brief and notified them of their right to file pro se points of appeal. Despite being given the opportunity to do so, Duvall and Dollar have filed no pro se points for reversal. We grant counsel's motion to withdraw and affirm the trial court's adjudication of dependency-neglect.

*Violation of Fourth Amendment rights*

At the beginning of the adjudication hearing and during the testimony of caseworker Angel Simpson, Dollar objected to the admission of the photos taken by Simpson when she investigated a call received on the child-abuse hotline regarding maltreatment of E.D. due to threat of harm, inadequate supervision, and environmental neglect. The photos showed the condition of Duvall and Dollar's house. Dollar contended that DHS was not authorized to enter their home without a warrant; that such entry violated his Fourth Amendment rights; and that the photos should be suppressed. The trial court refused to suppress the photos. Although appellants' counsel discusses in depth why this objection is not meritorious, we hold that it is unnecessary to analyze that argument in this case. Here, Simpson's testimony was that she asked to see the house and Duvall allowed her to do so. It was not until after Simpson had seen the house and taken photographs that Duvall called Dollar, who then told Simpson to leave the house. Duvall did not argue that she refused consent for Simpson to enter the house—in fact, she testified that she did not say no. Voluntary consent to inspect the premises by a co-inhabitant is sufficient. *Wigley v. State*,

---

1. In *Gipson v. Arkansas Department of Human Services*, 2011 Ark. App. 137, 2011 WL 693595, this court, in a footnote, stated that although *Linker–Flores* specifically addressed and authorized no-merit appeals from a ter-mination-of-parental-rights order, a no-merit appeal from an adjudication order is also authorized under Rule 6–9 of the Rules of the Arkansas Supreme Court and Court of Appeals.

73 Ark. App. 399, 44 S.W.3d 751 (2001). Because Duvall voluntarily consented for Simpson to enter the house, during which time Simpson took the photos, there was no Fourth Amendment violation.

*Sufficiency of evidence for adjudication of dependency-neglect*

After receiving the information from the child-abuse hotline, Simpson contacted the Atkins Police Department to accompany her to the residence because there had been allegations of Dollar making threats with guns and stating that he would kill anyone who tried to take his child. Duvall and another man were outside when they arrived; when Simpson made contact with Duvall regarding the allegations of Dollar's holding E.D. at gunpoint, Duvall denied that Dollar pointed the gun at the child; rather, he pointed it at a relative who was in the car with E.D. Duvall told Simpson that Dollar had used drugs in the past, but that he had not used drugs while they had been together; she denied using drugs.

Simpson testified that she asked Duvall about the condition of the house and asked to see the house, and Duvall allowed her to go inside the house. Simpson reported that it was difficult to walk through the house because of trash, groceries, cleaning supplies, baby food, and cleaning chemicals on the living room floor. She also testified that there were two knives on the kitchen floor and more chemicals in the hallway. Simpson said that she could not go into either bedroom without stepping through piles of clothes and trash; that there was broken glass on the floor; and that there was so much clutter that any number of things could have fallen on E.D. and hurt him. There was a closet with no door knob that had guns on the floor and on a shelf; Simpson was concerned that a child could open the door from the floor. She saw two guns in the house within reach of

E.D., and she was also concerned about open bottles of chemicals that were within his reach. Simpson stated that the house smelled strongly of dog feces and urine, and that there was also a strong smell of marijuana, although Duvall told her that it was incense.

As discussed above, Duvall called Dollar while Simpson was at the house, and Dollar told Simpson to leave the house. Simpson asked both Duvall and Dollar to submit to drug screens, which they both refused. Simpson explained to Duvall that if Duvall did not submit to a drug screen, Simpson would have to remove E.D. from the home.

On cross-examination, Simpson reiterated that Duvall was outside when she and the officer arrived and that law enforcement made the initial contact with Duvall and the man with her because of the allegations of gun use. When Simpson saw E.D., he smelled like he needed a bath. With regard to the state of the house, Simpson said that although there was nothing structurally wrong with the house, it needed to be cleaned up and there were holes in the door that needed to be repaired.

Luke Swady, the officer who accompanied Simpson to the house, testified that he went inside the residence and that there was so much clutter there was barely room to walk. According to him, he saw guns in a closet, a steak knife on the kitchen floor, and laundry piled halfway up the washing machine in the laundry room.

Melissa Cain, the caseworker assigned to this case, testified that Duvall and Dollar were ordered, among other things, to submit to hair-follicle tests within seven days, which neither of them had done. Cain also related that neither Duvall nor Dollar had executed the consents necessary to have the hair-follicle tests performed.

Duvall testified that she was not outside when Simpson came to her house, but that she was in the laundry room. She agreed that there was a lot of clutter in the house on the day Simpson was there, but asserted that she had cleaned the house after Simpson's visit. She denied that E.D. could open the closet door where the guns were stored because the working part of the knob was still in the door so the latch still had to be pulled to open the door. Duvall testified that Simpson told her that she was taking E.D. whether or not she took the drug test because of the condition of the house. Duvall initially said that she did not allow Simpson to search the house, but then admitted that she did not tell Simpson no; she said that she asked Simpson if she had to show her through the house and Simpson told her that she could either do it now or she could take E.D. Duvall admitted that she knew she had been ordered to comply with the hair-follicle testing, but she wanted to wait and see how the court ruled on the Fourth Amendment argument that Dollar was making at the hearing before she complied; she said that she was now willing to be tested.

Duvall explained that the gun incident happened when she woke Dollar and told him that "they" had E.D. outside, and that he grabbed the gun because he was alarmed and did not know who had his son. She denied that Dollar used methamphetamine or that he was physically abusive to her, and she disputed that there was dog feces on the floor and trash all over the house. Duvall admitted that the conditions of the house were unacceptable at the time Simpson saw it, but she explained that they had too much "stuff" and that there were issues with mice, which was why they were moving some of the items. She denied that she and Dollar used drugs together and said that she had never seen him use drugs. She also denied that E.D. smelled bad when Simpson took him.

Dollar testified that he was not present when E.D. was removed from the house, that he only had contact with someone from DHS over the phone. He said that Duvall called him and that he talked to an officer for a few seconds before Simpson took the phone and began "browbeating" him about taking a drug test. He asked Simpson why she was in his home, and she told him that she had received a report; he asked if she had a court order or a warrant to be there; when she said no, he told her to leave and would not talk to her anymore. He claimed that many allegations contained in the affidavit as a result of the call to the child-abuse hotline were untrue—that he was not using meth; that he was not physically abusive to Duvall; that there was not dog feces in the house; and that he had not held E.D. at gunpoint for sixteen hours. He explained that he was awakened in the middle of the night; E.D. had been taken out of the house; he did not know who had taken him; and he went outside, got E.D., did not threaten anyone, and went back into the house. He stated that they had taken everything out of the closets to remove mice feces and to get rid of the mice, and that the house was now clean and appropriate. He also denied that there was a strong odor of marijuana in the house. He agreed with Duvall that the closet door without a door knob was not accessible to E.D. He admitted that he had not complied with the trial court's order to submit to a hair-follicle test, but he said that he did plan to submit to the test.

The trial court stated from the bench that it did not believe that the situation had been created over just a few days, that it believed that it was something that had been going on for quite some time; that this had to be resolved if E.D. was going

to live in the house; and that while the parents asserted that it had been resolved, due to their failure to cooperate with DHS, there was no way for DHS to check on the situation. The trial court held that DHS had proved by a preponderance of the evidence that E.D. was dependent-neglected, and that he was at substantial risk of serious harm as a result of Duvall and Dollar's failure to provide for his essential and necessary physical needs by failing to provide a shelter that did not pose a risk to his health and safety. The trial court also pointed out that there was at least one firearm in reach of the child, as well as knives and broken glass. The trial court also found both Duvall and Dollar in contempt for failing to submit to hair-follicle tests and ordered them incarcerated, but suspended the incarceration upon their submission to hair-follicle testing and executing the consents necessary for the test.

■ A "dependent-neglected juvenile" is any juvenile who is at substantial risk of serious harm as a result of abandonment, abuse, sexual abuse, sexual exploitation, or neglect. Ark.Code Ann. § 9–27–303(18)(A) (Repl.2009). An adjudication hearing shall be held to determine whether the allegations in a petition are substantiated by proof. Ark.Code Ann. § 9–27–327(a)(1) (Repl.2009). DHS has the burden of proving that the children are dependent-neglected, and in dependency-neglect cases, that burden of proof is by a preponderance of the evidence. Ark.Code Ann. § 9–27–325(h)(1) & (2)(B) (Repl.2009). This court reviews a trial court's findings of fact de novo, but those findings will not be set aside unless they are clearly erroneous, giving due regard to the trial court's opportunity to judge the credibility of the witnesses; a finding is clearly erroneous when, although there is |₈evidence to support the finding, the reviewing court is left with the definite and firm conviction that a

mistake has been made. *Brewer v. Arkansas Dep't of Human Servs.,* 71 Ark. App. 364, 43 S.W.3d 196 (2001).

■ We cannot say that the trial court's finding that E.D. was dependent-neglected due to the condition of the house was clearly erroneous. There were numerous things in the house that could harm E.D., including open containers of chemicals, knives and guns within his reach, broken glass on the floor, and other unsanitary conditions that were unsafe.

### Contempt

■ The last adverse rulings were the trial court's findings of contempt with regard to both parties for their failure to submit to hair-follicle testing. Both Duvall and Dollar admitted during their testimony that they did not comply with this order of the trial court. The disobedience of an order of a court having jurisdiction to enter it constitutes contempt, and punishment for contempt is an inherent power of a court. *White v. Taylor,* 19 Ark. App. 104, 717 S.W.2d 497 (1986). A finding of contempt will be reversed only when it is against the preponderance of the evidence. *Id.* Here, both Duvall and Dollar openly admitted that neither of them had followed this order of the trial court; therefore, the trial court's finding of contempt cannot be said to be against the preponderance of the evidence.

Counsel's motion to withdraw is granted, and the adjudication of dependency-neglect is affirmed.

GLADWIN and WYNNE, JJ., agree.