IN THE SUPREME COURT OF APPEALS OF WEST VIRGINIA

January 2014 Term

_____

No. 12-1486

_____

**FILED**

**June 4, 2014**

released at 3:00 p.m.
RORY L. PERRY II, CLERK
SUPREME COURT OF APPEALS
OF WEST VIRGINIA

STATE OF WEST VIRGINIA,
Plaintiff Below, Respondent

v.

LAMAR DORSEY,
Defendant Below, Petitioner

_____

Appeal from the Circuit Court of Logan County
Honorable Eric H. O'Briant, Judge
Civil Action No. 12-F-32-O

AFFIRMED

_____

Submitted: January 28, 2014
Filed: June 4, 2014

Crystal L. Walden, Esq.
Deputy Public Defender
Office of Public Defender
Charleston, West Virginia
Attorney for Petitioner

Patrick Morissey, Esq.
Attorney General
Benjamin F. Yancey III, Esq.
Assistant Attorney General
Charleston, West Virginia
Attorneys for Respondent

JUSTICE LOUGHRY delivered the Opinion of the Court.
CHIEF JUSTICE DAVIS dissents and reserves the right to file a dissenting opinion.
JUSTICE BENJAMIN concurs, in part, and dissents, in part, and reserves the right to file a separate opinion.

SYLLABUS BY THE COURT

1.      "When reviewing a ruling on a motion to suppress, an appellate court should construe all facts in the light most favorable to the State, as it was the prevailing party below.  Because of the highly fact-specific nature of a motion to suppress, particular deference is given to the findings of the circuit court because it had the opportunity to observe the witnesses and to hear testimony on the issues.  Therefore the circuit court's factual findings are reviewed for clear error."  Syl. Pt. 1, *State v. Lacy*, 196 W.Va. 104, 468 S.E.2d 719 (1996).

2.      "In contrast to a review of the circuit court's factual findings, the ultimate determination as to whether a search or seizure was reasonable under the Fourth Amendment to the United States Constitution and Section 6 of Article II of the West Virginia Constitution is a question of law that is reviewed *de novo*.  Similarly, an appellate court reviews *de novo* whether a search warrant was too broad.  Thus, a circuit court's denial of a motion to suppress evidence will be affirmed unless it is unsupported by substantial evidence, based on an erroneous interpretation of the law, or based on the entire record, it is clear that a mistake has been made."  Syl. Pt. 2, *State v. Lacy*, 196 W.Va. 104, 468 S.E.2d 719 (1996).

3. "The Fourth Amendment of the *United States Constitution*, and Article III, Section 6 of the *West Virginia Constitution* protect an individual's reasonable expectation of privacy." Syl. Pt. 7, *State v. Peacher,* 167 W.Va. 540, 280 S.E.2d 559 (1981).

4. An individual who is unwelcome in the dwelling of another, or who has procured or maintained access to the dwelling through coercion, threats of violence or exploitation, does not have an expectation of privacy that society is willing to recognize as reasonable and, therefore, cannot claim the protections afforded by the Fourth Amendment of the United States Constitution and Article III, Section 6 of the West Virginia Constitution.

5. "There is no absolute right under either the West Virginia or the United States Constitutions to plea bargain. Therefore, a circuit court does not have to accept every constitutionally valid guilty plea merely because a defendant wishes to so plead." Syl. Pt. 2, *State ex rel. Brewer v. Starcher*, 195 W.Va. 185, 465 S.E.2d 185 (1995).

6. "Where an offer of evidence is made under Rule 404(b) of the West Virginia Rules of Evidence, the trial court, pursuant to Rule 104(a) of the West Virginia Rules of Evidence, is to determine its admissibility. Before admitting the evidence, the trial court should conduct an *in camera* hearing as stated in *State v. Dolin,* 176 W.Va. 688, 347 S.E.2d 208 (1986). After hearing the evidence and arguments of counsel, the trial court must be satisfied by a preponderance of the evidence that the acts or conduct occurred and that the

defendant committed the acts. If the trial court does not find by a preponderance of the evidence that the acts or conduct was committed or that the defendant was the actor, the evidence should be excluded under Rule 404(b). If a sufficient showing has been made, the trial court must then determine the relevancy of the evidence under Rules 401 and 402 of the West Virginia Rules of Evidence and conduct the balancing required under Rule 403 of the West Virginia Rules of Evidence. If the trial court is then satisfied that the Rule 404(b) evidence is admissible, it should instruct the jury on the limited purpose for which such evidence has been admitted. A limiting instruction should be given at the time the evidence is offered, and we recommend that it be repeated in the trial court's general charge to the jury at the conclusion of the evidence." Syl. Pt. 2, *State v. McGinnis*, 193 W.Va. 147, 455 S.E.2d 516 (1994).

LOUGHRY, Justice:

This case is before this Court upon the appeal of the petitioner and defendant below, Lamar Dorsey (hereinafter the "petitioner"), from the November 9, 2012, final order of the Circuit Court of Logan County, sentencing him for his jury convictions of two counts of conspiracy in violation of West Virginia Code § 61-10-31 (2010)[1] and two counts of delivery of crack cocaine, a controlled substance, in violation of West Virginia Code § 60A-4-401 (2010).[2] In this appeal, the petitioner asserts that the circuit court erred by (1) denying his motion to suppress evidence seized from the residence where he was staying at the time of his arrest; (2) summarily rejecting a plea agreement that the petitioner was allegedly willing to accept; and (3) allowing the State to proffer evidence it sought to admit at trial pursuant to Rule 404(b) of the West Virginia Rules of Evidence[3] and ruling on the admissibility of that evidence based solely on the proffer. Upon review of the record, the parties' briefs and oral argument, as well as the pertinent authorities, we find no reversible error and affirm the final order.

---

[1]West Virginia Code § 61-10-31 provides in pertinent part: "It shall be unlawful for two or more persons to conspire (1) to commit any offense against the State[.]"

[2]West Virginia Code § 60A-4-401(a) states, in relevant part, that "it is unlawful for any person to manufacture, deliver, or possess with intent to manufacture or deliver, a controlled substance."

[3]*See infra* note 9.

## I. Factual and Procedural Background

In October 2010, the petitioner, a resident of Columbus, Ohio, began staying intermittently with Joseph Scott Osborne, a resident of Logan County, West Virginia. According to Mr. Osborne, the petitioner was staying with him to sell narcotics from his residence. In exchange for allowing the petitioner to stay in his house and run his drug operation, Mr. Osborne received crack cocaine from the petitioner. One of the petitioner's customers during this period was Wendi Gillespie, a neighbor of Mr. Osborne. In December 2010, the petitioner began staying with Ms. Gillespie at her trailer in Kistler, West Virginia,[4] and continued to operate his drug trade from her home.[5] The petitioner and Ms. Gillespie had no prior social relationship, and their only previous interactions had occurred when Ms. Gillespie purchased narcotics from the petitioner. In exchange for allowing the petitioner to stay in her home, Ms. Gillespie was paid $20.00 in crack cocaine for every $100.00 of crack cocaine sold by the petitioner. Additionally, the petitioner supplied Ms. Gillespie with other drugs, including marijuana, and helped pay at least one of her utility bills.

In January of 2011, the West Virginia State Police received two separate tips from known informants that the petitioner was selling crack cocaine out of Ms. Gillespie's

[4]According to Ms. Gillespie, the petitioner wanted to stay with her because she had electricity and water in her home and Mr. Osborne did not.

[5]Ms. Gillespie testified that she rented her home and that only her name was on the lease. She further stated that when the petitioner arrived at her home to begin staying with her, his only belongings were a jacket and the clothes he was wearing.

residence. Believing that the statements of the informants alone were not sufficient to secure a warrant, the State Police decided to seek the cooperation of Ms. Gillespie by visiting her residence and conducting a "knock and talk."[6] Trooper J. K. Harris, accompanied by three other officers–Troopers Hensley, Dick, and Powers–drove to Ms. Gillespie's home on January 21, 2011, for that purpose.[7]

Upon arrival, the four officers took positions on both sides of Ms. Gillespie's home. During proceedings below, Trooper Harris testified that the three other officers surrounded the home to cover the exits of the residence and to ensure officer safety. He then walked onto the front porch of the home and knocked on the door. According to Trooper Harris, no one came to the door immediately, but he heard activity inside the trailer. As Trooper Harris knocked a second time, Trooper Hensley, who was stationed at the rear of the residence, saw an individual run through the house, and heard the sound of a toilet flushing. Trooper Harris knocked once again and announced that he was with the State Police and asked Ms. Gillespie to open the door. Ms. Gillespie responded that she was coming to open the door.

---

[6]"A 'knock and talk' . . . is a procedure used by police officers to investigate a complaint where there is no probable cause for a search warrant. The police officers knock on the door, try to make contact with persons inside, and talk to them about the subject of the complaints." *Murphy v. State*, 898 So.2d 1031, 1032 n.4 (Fla. Dist. Ct. App. 2005).

[7]According to Trooper Harris, he went to Ms. Gillespie's home with three additional officers because the petitioner had a previous firearms charge, and he believed that officer safety might be an issue if the petitioner was within the residence.

Ms. Gillespie testified during the proceedings below that when the State Police arrived at her residence, the petitioner ran into her bedroom where she was smoking marijuana. The petitioner informed her that the police were outside, and then threatened to kill her if she opened the door, making a throat-cutting motion across his neck while delivering the threat. Ms. Gillespie stated that after a few minutes delay, she asked who was outside. Ms. Gillespie further testified that after Trooper Harris identified himself as a police officer, she waited a few more minutes and then opened the front door to the residence and the officers entered her home.

With the knowledge that there were other individuals on the premises and with their whereabouts unknown, Trooper Harris and his fellow officers proceeded to secure the residence and the persons therein. In the bathroom of the home, Trooper Harris found the petitioner standing in front of the toilet. While securing the petitioner, Trooper Harris observed the toilet running and a substance believed to be marijuana floating in the water. Additionally, one other individual, Joseph Hurley, was found on the premises. Mr. Hurley later gave a statement admitting that he was there to purchase crack cocaine from the petitioner.

After securing the petitioner and Mr. Hurley, Trooper Harris spoke with Ms. Gillespie and informed her that he had received information that crack cocaine was being sold out of her residence by the petitioner. Trooper Harris then asked Ms. Gillespie for

4

permission to search the premises, which she granted voluntarily.**⁸** Upon searching the home,

the officers found $2,204 in cash and a digital scale and razor blade with cocaine residue on

both items in a bedroom. They also found a 9mm handgun hidden beneath a washer and

dryer. After taking statements from Ms. Gillespie and Mr. Hurley, the petitioner was

arrested. He was indicted on drug-related charges in January 2012. Prior to his trial, the

petitioner filed a motion to supress the evidence seized from Ms. Gillespie's home at the time

of his arrest. Following a hearing, the motion was denied.

In March 2012, the circuit court conducted a pre-trial evidentiary hearing

regarding the State's proposed submission of evidence at the petitioner's trial pursuant to

Rule 404(b) of the West Virginia Rules of Evidence.**⁹** The State, seeking to curtail

---

[8]Ms. Gillespie's signature appears on the consent to search form in the record before this Court. The record also shows that Ms. Gillespie testified at the suppression hearing and at trial that she consented to the search.

[9]West Virginia Rule of Evidence 404(b) provides:

> *Other crimes, wrongs, or acts*.–Evidence of other crimes, wrongs or acts is not admissible to prove the character of a person in order to show that he or she acted in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident, provided that upon request by the accused, the prosecution in a criminal case shall provide reasonable notice in advance of trial, or during trial if the court excuses pretrial notice on good cause shown, of the general nature of any such evidence it intends to introduce at trial.

unnecessary and duplicative presentation of evidence, asked the circuit court if it could simply make a proffer of the evidence it hoped to present rather than calling witnesses to testify during the hearing. The circuit court allowed the proffer to proceed, with the caveat that it would consider whether the proffer was sufficient at the end of the presentation. The petitioner's counsel did not object to the proffer during the hearing. After the State outlined what the evidence would be, the circuit court found the proffer sufficient and ruled that the evidence would be admissible at trial.[10]

The petitioner's trial took place in July 2012. Before the trial, the State and the petitioner discussed a number of plea agreements. One proposal was presented to the circuit court at a pre-trial conference, but the parties could not agree on final terms at that time and no plea was entered. On the first day of trial, the circuit court was made aware of three possible plea agreements, all of which the petitioner rejected. On the second day of trial, the parties again attempted to reach a plea agreement. There were two proposals discussed that day, and the petitioner indicated that he would be amenable to accepting one of the offers. This proposal was presented to the circuit court on the record informally. The court then stated that it had given the parties time to discuss a plea agreement on the first day of trial, and it was not inclined to allow them further time to work out the proposal.

---

[10]The petitioner objected to the admission of the 404(b) evidence at trial, and in his Motion for a New Trial. The circuit court overruled the trial objection and denied the Motion for a New Trial.

At the conclusion of the presentation of evidence, the jury returned a verdict convicting the petitioner on two counts of conspiracy to deliver a Schedule II controlled substance and two counts of delivery of a Schedule II controlled substance. The circuit court sentenced the petitioner to two indeterminate terms of one-to-five years in the penitentiary for the conspiracy counts, and two indeterminate terms of one to fifteen years for the delivery counts. The court further ordered that all sentences were to be served consecutively. This appeal followed.

## II. Standard of Review

In syllabus point three of *State v. Vance*, 207 W.Va. 640, 535 S.E.2d 484 (2000), this Court explained that

> [i]n reviewing challenges to findings and rulings made by a circuit court, we apply a two-pronged deferential standard of review. We review the rulings of the circuit court concerning a new trial and its conclusion as to the existence of reversible error under an abuse of discretion standard, and we review the circuit court's underlying factual findings under a clearly erroneous standard. Questions of law are subject to a de novo review.

Other relevant standards of review will be set forth in the discussion of each assignment of error.

## III. Discussion

As set forth above, the petitioner has asserted three assignments of error. Each alleged error will be considered separately below.

7

*A. Denial of Motion to Suppress Evidence*

The petitioner first contends that the circuit court erred by refusing to suppress the evidence seized by the police during the search of Ms. Gillespie's residence. The petitioner argues that the state troopers made an illegal warrantless entry into Ms. Gillespie's residence, rendering any consent to search she gave invalid. Therefore, the petitioner reasons that the evidence obtained as a result of that search was tainted and inadmissible. The State argues, however, that the petitioner has no right to challenge the search and seizure of evidence from Ms. Gillespie's home because he had no legitimate expectation of privacy. We agree.

Our standards for reviewing a circuit court's ruling on a motion to suppress evidence were set forth in *State v. Lacy*, 196 W.Va. 104, 468 S.E.2d 719 (1996). In syllabus point one of *Lacy*, this Court explained that

> [w]hen reviewing a ruling on a motion to suppress, an appellate court should construe all facts in the light most favorable to the State, as it was the prevailing party below. Because of the highly fact-specific nature of a motion to suppress, particular deference is given to the findings of the circuit court because it had the opportunity to observe the witnesses and to hear testimony on the issues. Therefore the circuit court's factual findings are reviewed for clear error.

*Id.* at 107, 468 S.E.2d at 722. This Court further held in *Lacy* that

> [i]n contrast to a review of the circuit court's factual findings, the ultimate determination as to whether a search or

8

seizure was reasonable under the Fourth Amendment to the United States Constitution and Section 6 of Article II of the West Virginia Constitution is a question of law that is reviewed *de novo*. Similarly, an appellate court reviews *de novo* whether a search warrant was too broad. Thus, a circuit court's denial of a motion to suppress evidence will be affirmed unless it is unsupported by substantial evidence, based on an erroneous interpretation of the law, or based on the entire record, it is clear that a mistake has been made.

196 W.Va. at 107, 468 S.E.2d at 722, syl. pt.2.

It is axiomatic that "[t]he Fourth Amendment of the *United States Constitution*, and Article III, Section 6 of the *West Virginia Constitution* protect an individual's reasonable expectation of privacy." Syl. Pt. 7, *State v. Peacher,* 167 W.Va. 540, 280 S.E. 2d 559 (1981). As such, "Fourth Amendment rights are personal rights which, like some other constitutional rights, may not be vicariously asserted." *Alderman v. United States*, 394 U.S. 165, 174 (1969). Therefore, we must begin our analysis by first determining whether the petitioner has standing to make a claim for violation of his rights under the Fourth Amendment and Section 6 of Article III of the West Virginia Constitution as a result of the search and seizure of evidence from Ms. Gillespie's residence.

This Court has recognized that "[a] claim of protection under the Fourth Amendment and the right to challenge the legality of a search depends not upon a person's property right in the invaded place or article of personal property, but upon whether the person has a legitimate expectation of privacy in the invaded place or thing." *Wagner v.*

*Hedrick*, 181 W.Va. 482, 487, 383 S.E.2d 286, 291 (1989) (citing *Katz v. United States*, 389 U.S. 347, 353, 88 S.Ct. 507, 512, 19 L.Ed.2d 576, 583 (1967)). Therefore, "if a person is in such a position that he cannot reasonably expect privacy, a court may find that an unreasonable Fourth Amendment search has not taken place." 181 W.Va. at 487, 383 S.E.2d at 291.

"At the threshold, then, one who asserts a Fourth Amendment violation must demonstrate a 'reasonable expectation of privacy' in the subject of the seizure. That expectation is to be measured both subjectively and by an objective standard of reasonableness." *Marano v. Holland*, 179 W.Va. 156, 163, 366 S.E.2d 117, 124 (1988). Thus, an expectation of privacy is legitimate when an individual demonstrates that he or she personally has an expectation of privacy in the place searched, and also demonstrates that the expectation is reasonable. *Rakas v. Illinois*, 439 U.S. 128, 143-44 (1978). In order for an expectation to be "reasonable" it must have "a source outside of the Fourth Amendment, either by reference to concepts of real or personal property law or to understandings that are recognized and permitted by society." 439 U.S. at 143-144 n.12. In other words, the individual's subjective expectation of privacy must be "one that society is prepared to recognize as 'reasonable.'" *Id.*

In this case, the petitioner argues that as an invited guest in Ms. Gillespie's home, he had a reasonable expectation of privacy. In support of his argument, the petitioner

10

relies upon this Court's holding in *State v. Adkins*, 176 W.Va. 613, 346 S.E.2d 762 (1986), and the holding of the United States Supreme Court in *Minnesota v. Olson*, 495 U.S. 91 (1990). In *Adkins*, the defendant was convicted of felony possession with intent to distribute a controlled substance. Appealing the conviction, the defendant argued that the trial court erred by not suppressing the evidence seized from the home of his girlfriend, where he frequently stayed, because the search warrant was invalid due to the fact that the warrant affidavit failed to establish probable cause. Recognizing that "defendants charged with crimes of possession may only claim the benefits of the exclusionary rule if their own Fourth Amendment rights have in fact been violated,"[11] this Court held that

> [a] defendant who is more than a casual visitor to an apartment or dwelling in which illegal drugs have been seized has the right under the Fourth Amendment to the United States Constitution and Article III, Section 6 of the West Virginia Constitution to challenge the search and seizure of illegal drugs which he is accused of possessing.

*Adkins*, 176 W.Va. at 614, 346 S.E.2d at 764, syl. pt. 1.

In *Olson*, the United States Supreme Court considered whether an overnight guest had standing to challenge his warrantless arrest in the home where he was staying. Applying *Katz*, the Supreme Court found that Mr. Olson had both a subjective reasonable expectation of privacy as an invited overnight guest, as well as a expectation of privacy that

---

[11]*Adkins*, 176 W.Va. at 616, 346 S.E.2d at 765 (quoting *United States v. Salvucci*, 448 U.S. 83, 85 (1980)).

11

society is willing to recognize as legitimate. Justice White, writing for the majority, explained that "[t]o hold that an overnight guest has a legitimate expectation of privacy in his host's home merely recognizes the everyday expectations of privacy that we all share." *Olson*, 495 U.S. at 98. The Supreme Court further stated:

> Staying overnight in another's home is a longstanding social custom that serves functions recognized as valuable by society. We stay in others' homes when we travel to a strange city for business or pleasure, when we visit our parents, children, or more distant relatives out of town, when we are in between jobs or homes, or when we house-sit for a friend. We will all be hosts and we will all be guests many times in our lives. From either perspective, we think that society recognizes that a houseguest has a legitimate expectation of privacy in his host's home.
>
> . . . .
>
> That the guest has *a host who has ultimate control* of the house is not inconsistent with the guest having a legitimate expectation of privacy. The *houseguest is there with the permission of his host, who is willing to share his house and his privacy with his guest*. It is unlikely that the guest will be confined to a restricted area of the house; and when the host is away or asleep, the guest will have a measure of control over the premises. The *host may admit or exclude from the house as he prefers*, but it is unlikely that he will admit someone who wants to see or meet with the guest over the objection of the guest. On the other hand, few houseguests will invite others to visit them while they are guests without consulting their hosts; but the latter, who have the authority to exclude despite the wishes of the guest, will often be accommodating.

*Id*. at 98-99 (*emphasis added*).

12

The petitioner argues that because he was "more than a casual visitor" to Ms. Gillespie's residence and was, in fact, an overnight guest for the three-week period preceding his arrest, he has standing to challenge the search and seizure of evidence from her home pursuant to *Adkins* and *Olson*. We find, however, that the petitioner's reliance upon *Adkins* and *Olson* is misplaced as those cases are clearly distinguishable from the facts presented here. While the record indicates that the petitioner was initially an invited guest of Ms. Gillespie, the record also shows that the petitioner quickly assumed total control of her residence to operate his illegal drug trade, threatening to kill Ms. Gillespie during the three weeks preceding his arrest when she observed his drug deals taking place and again when the police arrived at her home on January 21, 2011. While we have not had occasion to consider the privacy rights of an overnight guest of premises that are subjected to government intrusion after that guest's presence has become unwelcome or wrongful, other jurisdictions have performed this analysis.

For example, in *Granados v. State*, 85 S.W.3d 217 (Tex. Crim. App. 2002), the defendant, who was convicted of capital murder, argued on appeal that evidence obtained at the crime scene–his girlfriend's apartment–should have been suppressed. He asserted that he had a legitimate expectation of privacy in her home because he had been staying there for approximately a month while trying to find a permanent residence. The evidence showed, however, that prior to his arrest, the defendant's girlfriend had asked him to get his belongings and leave the residence after a series of arguments. Angered by her request, the

13

defendant attacked his girlfriend with a knife, stabbing her repeatedly. In an attempt to placate him, the defendant's girlfriend told him that she loved him and would not call the police if he would simply leave the premises. Subsequently, when the defendant caught his girlfriend attempting to contact the police, he stabbed her again and then killed her child. When the defendant's girlfriend failed to answer phone calls from her family and did not appear at her place of employment, the police went to her residence and ultimately broke in and arrested the defendant.

In his appeal to the Court of Criminal Appeals of Texas, the defendant in *Granados* argued that the evidence obtained by the police after they entered the apartment was not admissible at his trial because the police did not have probable cause to believe that a crime had been committed and their search was not justified under any exception to the warrant requirement of the Fourth Amendment. Rejecting the defendant's argument, the *Granados* court observed that

> [t]he overnight guest doctrine assumes that the guest is present with the host's permission when a government intrusion occurs, and that the guest must accept the reality that the host will permit others to intrude . . . *Olson* suggest that when, for example, the host chooses to allow others, such as the police, inside, or when the houseguest no longer has the permission of his guest to be on the premises, the guest's expectation of privacy diminishes.

85 S.W.2d at 224. Accordingly, the court concluded that because the defendant's girlfriend, his host, no longer wished for him to be in the residence, the defendant concomitantly no

14

longer had an expectation of privacy that society would view as reasonable. The court explained:

> [W]e must consider not simply whether the appellant had some subjective privacy interest in the premises (he almost always will), but whether, once he had been instructed to gather his belongings and leave the premises, society would view his claim of privacy as reasonable . . . our social traditions–that is, the customs and habits that characterize the relationship of guest and host in our culture–do not favor such a broad and charitable view of the reasonableness of one's expectation of privacy.

85 S.W.2d at 225-26.

In *State v. McCray*, 583 N.W.2d 668 (Wis. Ct. App. 1998), the defendant was convicted of possession of cocaine with intent to deliver. He appealed his conviction based on the denial of his motion to suppress the evidence seized following the execution of a no-knock warrant at a house belonging to someone else. The warrant was based on information that the sons of a woman named Ella Hodges were selling drugs out of her home. When the police executed the warrant, they found the defendant lying on a couch in the basement of the home. Crack cocaine in a plastic bag was situated on the couch next to the defendant and several other plastic bags containing cocaine were located in the rafters of the basement about ten feet from the defendant. Ms. Hodges testified that she was unaware of the defendant's presence in her home, but one of her sons admitted that he had met the defendant the night before the warrant was executed when the defendant came to the house with a friend. Ms. Hodges's son had given the defendant permission to stay in the basement until someone came to pick him up but had also told him that if it got too late, he would need to

15

leave.   Affirming the lower court's denial of the defendant's motion to suppress, the Court of Appeals of Wisconsin stated:

> In regard to the constitutional issue:  whether one who was permitted to use the basement of a house while waiting to sell drugs, but who had exceeded his authorized stay at the time of the police search, has demonstrated a reasonable expectation of privacy in the house sufficient to establish standing to challenge the search under the Fourth Amendment.   We conclude he does not.

583 N.W.2d at 671.

In *Commonwealth v. Mallory*, 775 N.E.2d 764 (Mass. App. Ct. 2002), the defendant appealed his rape conviction asserting that evidence admitted at his trial which had been seized without a warrant should have been suppressed.  Prior to his arrest, the defendant was staying in the second floor bedroom of a single family home rented by an individual named Robert Burns. Although the defendant was not paying rent, he shared the food expenses.  Approximately three months after he began staying at the residence, the defendant raped Mr. Burns's seventeen-year-old daughter.   After the rape, the defendant fled the premises.  When the police arrived, they searched the defendant's room without a warrant and seized various items the victim said were used in the defendant's attack upon her. Finding no error in the lower court's refusal to suppress this evidence, the Appeals Court of Massachusetts stated:

> The "very limited expectation of privacy" the defendant had in the room prior to February 16, [the date of the rape] which was dependent upon the relationship between the defendant and his host, disintegrated that afternoon . . . The

> relationship between the defendant and his host was thereby destroyed. . . .
>
> In sum, when the searches occurred, if he had any remaining subjective expectation of privacy regarding his room, the defendant certainly had no expectation of privacy that society objectively would recognize as reasonable.

775 N.E.2d at 768 (citations omitted).

These cases evince the principle that a guest in a home must be welcomed by his host at the time of the government intrusion in order to have a reasonable expectation of privacy. In other words, "an overnight guest's expectation of privacy is affected by the host's ability to control the use of the premises and the period of time that a guest will be permitted to stay." *Granados*, 85 S.W.2d at 225. Although there is no evidence in the case at bar that Ms. Gillespie asked the petitioner to leave, it is clear that the petitioner maintained his presence in her home through his threats of violence toward her and his exploitation of her drug addiction, rather than as invited guest who was welcomed. At the petitioner's trial, Ms. Gillespie testified about what occurred when she observed the petitioner's drug transactions.

> Q: Now you mentioned that you saw some of those. Would anything happen if you were present on any of these transfers?
>
> A: He would ask me to go in another room a lot [sic] of the transactions.
>
> Q: How would those discussions take place? In other words, what was Mr. Dorsey's demeanor when he was asking you to leave?

17

A: It wasn't very nice. It was bitch, go back in your room. You don't need to be seeing this.

Q: Were there any threats ever made to you during this?

A: There was once or twice.

Q: Describe what types of threats were made to you?

A: He told me he would kill me if I didn't go back in my room.

Q: Did you believe him?

A: At that point and time, yes I did.


Ms. Gillespie acknowledged that she was able to leave her home during the petitioner's stay and could have gone to the police but stated that she chose not to because she was afraid of the petitioner and because he was her source for the drugs she needed to feed her addiction. In that regard, she testified:

Q: Let me ask you, why didn't you go the police?

A: I was scared to. I was afraid of turning him into the police. I was just afraid all the way around. I didn't know what to do.

Q: Was there another reason you might not have wanted Mr. Dorsey to leave?

A: I was getting high too and it was my home.

Q: What was he supplying you for staying at your residence?

A: Crack, marijuana.

Q: Were you an addict at that time?

18

A: I was.

Q: At the time when Mr. Dorsey was staying at your residence were you getting your crack from anyone else?

A: I wasn't.

Q: Would it be fair to say with Mr. Dorsey there you had a ready supply of crack cocaine available?

A: That's the reason I had him there.

Although the petitioner was initially an invited guest in Ms. Gillespsie's home, he immediately took advantage of her drug addiction and used her dependency upon the drugs he was supplying her to control the premises and carry out his drug operation. The relationship between Ms. Gillespie and the petitioner is best characterized as that of drug addict and drug supplier rather than host and guest. In any event, their relationship further disintegrated when the State Police arrived at the residence on January 21, 2011, and knocked on the front door. Ms. Gillespie testified that once the petitioner discovered that the police were outside, "he told me that I best not open that door, that he was going to kill me or things would get ugly." Ms. Gillespie further stated that "I was relieved once the cops came in because I knew that it was over." She explained that she did not like the person she had become as a result of her drug addiction and that she wanted the petitioner out of her home.

Based on all the above, we are unable to find that the petitioner had an expectation of privacy that society would characterize as reasonable. Accordingly, we now hold that an individual who is unwelcome in the dwelling of another, or who has procured or maintained access to the dwelling through coercion, threats of violence or exploitation, does not have an expectation of privacy that society is willing to recognize as reasonable and, therefore, cannot claim the protections afforded by the Fourth Amendment of the United States Constitution and Article III, Section 6 of the West Virginia Constitution.

While we have concluded that the petitioner had no reasonable expectation of privacy because of the manner in which he procured and maintained access to Ms. Gillespie's home, we further find that the petitioner could not challenge the seizure of evidence because Ms. Gillespie consented to the search. In *Olson*, while finding that an overnight guest has a legitimate expectation of privacy in a host's home, the Supreme Court also observed that "[f]rom the overnight guest's perspective, he seeks shelter in another's home precisely because it provides him with . . . a place where [the guest] . . . and his possessions will not be disturbed by anyone but his host and *those his host allows inside.*" 495 U.S. at 99 (emphasis added). Based upon this observation, other courts have concluded that an overnight guest cannot challenge a search and seizure under the Fourth Amendment when their host has consented to the government intrusion.

20

For example, in *United States v. Oates,*173 F.3d 651 (8th Cir. 1999), the defendant, upon his release from prison, asked his friend, Vadia Smith, if he could move into her house. The defendant then converted the house into a crack den and even brought in another friend to help manage the operations. Smith went to the police and signed a consent form permitting the officers to search her dwelling, which they did, after confirming with the property manager that only Smith and her children were authorized to live in the house. Rejecting the defendant's argument that the police search of the bedroom he occupied in Smith's house was illegal despite Smith's consent, the United States Court of Appeals for the Eighth Circuit found that the

> officers had sufficient evidence to establish that Smith had authority to permit the search of the [defendant's] bedroom. This conclusion was based on the statement of Smith and the property manager, in addition to the fact that [the defendant] paid no rent to Smith. The evidence indicates that Oates was only a guest in Smith's home, and probably one that had overstayed his welcome. Following the teachings of *Olson* it cannot be said that the authorities erred in concluding that the [defendant's] host, Smith, could consent to a search of her entire residence by authorities. In short, the facts available . . . justified a reasonable officer in the belief that the consenting party has authority over the premises.

*Id.* at 657 (internal quotations and citation omitted); *see also United States v. Isom*, 588 F.2d 858 (2d Cir. 1978) (finding no violation of defendant's Fourth Amendment rights because owner of home where defendant had been staying intermittently consented to search); *Wigley v. State*, 44 S.W.3d 751, 754 (Ark. Ct. App. 2001) (finding that defendant, an overnight guest in home of parolee who had executed a "consent-in- advance" form as condition of his

21

parole, did not have reasonable expectation of privacy because "an overnight guest has no reasonable expectation of privacy when the host consents to the search").

We reject the petitioner's contention that the police made an illegal entry into Ms. Gillespie's home thereby rendering her consent to search invalid. During the suppression hearing, Ms. Gillespie testified that by opening the door, she was inviting the police to come into her home. Furthermore, assuming, arguendo, that the police entered Ms. Gillespie's home without permission, exigent circumstances justified the warrantless entry. We have explained that "[t]he circumstances that justify warrantless searches include those in which officers reasonably fear for their safety, where firearms are present, or where there is a risk of a criminal suspect's escaping or fear of destruction of evidence." *Lacy*, 196 W.Va. at 113, 468 S.E.2d at 728 (internal quotations and citation omitted). In this instance, the State Police reasonably believed that a crime was being committed and that evidence was being destroyed when they heard a toilet flushing and other movement inside the residence. In addition, the police had reason to fear for their safety given that the petitioner's criminal history included a firearms charge.[12]

The fact that the police knocking at the door may have prompted the petitioner to attempt to destroy evidence of his drug operation does not render the exigent

---

[12]*See supra* note 7.

22

circumstances exception to the warrant requirement inapplicable. As the United States Supreme Court explained in *Kentucky v. King*, 131 S.Ct. 1849 (2011),

> the exigent circumstances rule justifies a warrantless search when the conduct of the police preceding the exigency is reasonable in the same sense. Where, as here, the police did not create the exigency by engaging or threatening to engage in conduct that violates the Fourth Amendment, warrantless entry to prevent the destruction of evidence is reasonable and thus allowed.

131 S.Ct. at 1858. In *King*, the police officers chased a suspect from a controlled buy of crack cocaine into a building at an apartment complex. The officers approached the door of the apartment they believed the suspect had entered and banged as "'loud as they could,'" announcing "'This is the police'" or "Police, police, police." *Id.* at 1854. As soon as they started banging on the door, the officers could hear persons and things moving inside the apartment. Believing that drug-related evidence was about to be destroyed, the officers announced that they "'were going to make entry inside the apartment'" and then kicked in the door and entered the apartment. *Id.* Upon entering the apartment they did not find the suspect they were chasing, but instead found three other persons smoking marihuana. During a protective sweep of the apartment, the officers observed marihuana and cocaine in plain view. In holding that "the exigent circumstances rule applies when the police do not gain entry to premises by means of an actual or threatened violation of the Fourth Amendment,"[13]

---

[13]For purposes of the opinion, the Court assumed that exigent circumstances existed. The case was remanded to the Kentucky Supreme Court to decide whether the sound of persons moving inside the apartment was sufficient to establish that evidence was being
(continued...)

23

the Supreme Court observed that "[o]ccupants who choose not to stand on their constitutional rights but instead elect to attempt to destroy evidence have only themselves to blame for the warrantless exigent-circumstances search that may ensue." 131 S.Ct. at 1862.

The petitioner points out that Ms. Gillespie gave two statements to the police, one the night of January 21, 2011, and another one about a month later, claiming that the police officers told her that if she did not open the door, they were going to kick it down. However, Ms. Gillespie later retracted those parts of her statements, denying that the officers threatened to kick the door down. She subsequently testified during the suppression hearing and at trial that it was Mr. Hurley who told her that if she did not open the door, the police would kick it in. Accordingly, we see no basis to conclude that the police gained entry into Ms. Gillespie's home by an actual or threatened violation of the Fourth Amendment. Once they were inside the residence and had secured all the occupants for their safety, the police obtained Ms. Gillespie's consent to search.

*B. Rejection of Plea Agreement*

Next, the petitioner contends that the circuit court erred by rejecting a plea agreement he reached with the State on the second day of his trial. According to the petitioner, the trial court failed to give fair consideration to the plea agreement, summarily

---

[13](...continued)
destroyed.

24

rejecting it because it was not presented until the second day of trial and the court determined that it "had given the parties more than enough time to reach an agreement the day before." The petitioner contends that the court's rejection of the agreement based solely on the timing of its presentation violates this Court's holding in *State v. Sears*, 208 W.Va. 700, 542 S. E.2d 863 (2000), which provides: "When a criminal defendant and the prosecution reach a plea agreement, it is an abuse of discretion for the circuit court to summarily refuse to consider the substantive terms of the agreement solely because of the timing of the presentation of the agreement to the court." *Id.* at 702, 542 S.E.2d at 865, syl. pt. 5. The State maintains, however, that the "plea agreement" was merely a plea proposal, and the court did not abuse its discretion in refusing to allow the parties additional time to finalize the agreement. We agree.

In *Sears*, the parties reached a plea agreement the day before the defendant's trial was scheduled to begin. Counsel for the defendant then requested that the prosecutor attend a hearing to present the agreement to the court. At the hearing, the court did not consider the merits of the plea agreement, but instead summarily rejected it pursuant to a local rule of its own making that prohibited entry of plea agreements after the conclusion of pre-trial hearings. The purpose of the local rule was to allow the court to control its docket by avoiding cancellation of trials due to plea agreements made at the last minute. Reversing the circuit court, this Court found that the discretion afforded a trial court to accept or reject

25

a plea agreement "should not be discarded for the sake of expediency." *Id.* at 705, 542 S.E.2d at 868.

Upon review, it is clear that *Sears* has no application in this instance because the parties had not actually reached a final plea agreement. Rather, the record shows that the parties presented a plea proposal to the court in an informal manner. While counsel for the petitioner advised the court that the petitioner was willing to accept the plea proposal, the State indicated that the petitioner would have to agree to certain stipulations. It is clear, therefore, that the plea agreement had not yet been finalized.

In syllabus point two of *State ex rel. Brewer v. Starcher*, 195 W.Va. 185, 465 S.E.2d 185 (1995), this Court held: "There is no absolute right under either the West Virginia or the United States Constitutions to plea bargain. Therefore, a circuit court does not have to accept every constitutionally valid guilty plea merely because a defendant wishes so to plead." We further held in *Brewer* that "the decision whether to accept or reject a plea agreement is vested almost exclusively with the circuit court." *Id.* at 188, 465 S.E.2d at 188, syl. pt. 3, in part. In so holding, we recognized that the court's discretion to accept or reject a plea agreement is tempered by the fact that "all plea agreements must be constitutionally acceptable and in compliance with procedural rules this Court mandates." *Id.* at 192, 465 S.E.2d at 192.

26

Given the circumstances of this case, we are unable to find that the trial court abused its discretion in refusing to grant the parties additional time to finalize the plea agreement. The record reflects that the parties had discussed multiple plea deals that the petitioner rejected because he could not get assurance from the court that he would receive probation. In presenting this final plea proposal to the court, the petitioner's counsel stated that he was bringing it to the court's attention "out of an abundance of caution" and indicated that he did not think the court would be inclined to accept the plea. Based on the above, we find no merit to the petitioner's argument.[14]

### C. The Proffer of 404(b) Evidence

The petitioner's final assignment of error concerns the manner in which the court considered and ruled upon the admissibility of the evidence the State sought to introduce at the petitioner's trial pursuant to Rule 404(b) of the West Virginia Rules of

---

[14]We note that the circumstances under which the trial court was approached with the plea proposal did not invoke the procedural requirements of Rule 11 of the West Virginia Rules of Criminal Procedure, which pertains to plea agreements. In that regard, this Court has held that

> [w]hen the parties to a criminal proceeding agree that the trial court should be approached informally to determine whether the court would be amenable to a proposed plea agreement, the procedures outlined under Rule 11 of the West Virginia Rules of Criminal Procedure do not apply to respond to the informal inquiry.

Syl. Pt. 1, *State v. Welch*, 229 W.Va. 647, 734 S.E.2d 194 (2012).

Evidence.[15]   The petitioner contends that by allowing the State to make a proffer of the 404(b) evidence and ruling upon that proffer alone, rather than requiring the State to present the actual evidence through the testimony of witnesses at the pre-trial hearing, the court committed reversible error.  The State, noting that the petitioner's counsel failed to object to the proffer of the 404(b) evidence during the hearing, maintains that the proffer was sufficient to allow the trial court to determine the admissibility of the evidence.  We agree.

Long ago, this Court recognized that  "as the control of the scope, latitude and method of introduction of evidence of collateral crimes and charges is vested in the trial court, motions to introduce and motions and objections for exclusion of such evidences are addressed to the sound discretion of the court."  Syl. Pt. 14,  *State v. Thomas*, 157 W. Va. 640, 203 S.E.2d 445 (1974).  Recognizing the potential for prejudice inherent in other-crime evidence, this Court then held in syllabus point two of *McGinnis,* 193 W.Va. 147, 455 S.E2.d 516 (1994), that

> [w]here an offer of evidence is made under Rule 404(b) of the West Virginia Rules of Evidence, the trial court, pursuant to Rule 104(a) of the West Virginia Rules of Evidence, is to determine its admissibility.  Before admitting the evidence, the trial court should conduct an in camera hearing as stated in *State v. Dolin*, 176 W.Va. 688, 347 S.E.2d 208 (1986).  After hearing the evidence and arguments of counsel, the trial court must be satisfied by a preponderance of the evidence that the acts or conduct occurred and that the defendant committed the acts.  If the trial court does not find by a preponderance of the evidence that the acts or conduct was committed or that the

---

[15]*See supra* note 9.

defendant was the actor, the evidence should be excluded under Rule 404(b). If a sufficient showing has been made, the trial court must then determine the relevancy of the evidence under Rules 401 and 402 of the West Virginia Rules of Evidence and conduct the balancing required under Rule 403 of the West Virginia Rules of Evidence. If the trial court is then satisfied that the Rule 404(b) evidence is admissible, it should instruct the jury on the limited purpose for which such evidence has been admitted. A limiting instruction should be given at the time the evidence is offered, and we recommend that it be repeated in the trial court's general charge to the jury at the conclusion of the evidence.

In this case, the petitioner contends that because the trial court failed to require the State to call witnesses to testify as to the nature of the 404(b) evidence, the court was unable to weigh the evidence and give proper consideration to its admissibility as required by *McGinnis*.

We recently considered whether a proffer of 404(b) evidence by the State was sufficient for the purpose of allowing the trial court to determine the admissibility of such evidence in *State v. Bruffey*, 231 W.Va. 502, 745 S.E.2d 540 (2013). In that case, the defendant was charged with robbery of a bank. The State gave notice that it wished to introduce evidence at the defendant's trial of a second robbery that occurred after the robbery for which the defendant was charged. The defendant was suspected of committing the second robbery, and the State sought to admit evidence related to the second robbery to show a common plan or scheme or identity as permitted by Rule 404(b). At the 404(b) hearing, the State, without objection from the defendant's counsel, proffered what the evidence would be regarding the second (uncharged) robbery the petitioner was suspected of committing.

29

Upon his conviction, the defendant filed an appeal, arguing that the court had erred by allowing the State to make a proffer of the 404(b) evidence.

In *Bruffey*, this Court explained that "the purpose of a 404(b) hearing is to allow a trial court to consider 'the similarities and differences between the collateral offenses and the present offenses [so it] can [apply] the balancing test to determine whether the probative value outweighs the prejudicial effect of such evidence.'" 231 W.Va. at —, 745 S.E2.d at 550 (citation omitted). Finding no error with regard to the court's admissibility ruling based solely on the proffer, this Court explained that the purpose of the 404(b) hearing was accomplished as the record showed that the court "reviewed at length the similarities between the charged and the uncharged offenses and determined that the probative value of the 404(b) evidence outweighed any prejudicial effect." 231 W.Va. at —, 745 S.E.2d at 550. The same analysis applies to the case at bar.

The 404(b) evidence the State sought to admit at the petitioner's trial was testimony from Ms. Gillespie, Mr. Osborne, and Mr. Hurley regarding uncharged drug transactions that they had participated in with the petitioner and their observation of the petitioner's sale of cocaine to other persons. In addition, the State sought to elicit testimony from Mr. Osborne that he had conspired with the petitioner to allow the sale of crack cocaine out of his house and that he had an arrangement with the petitioner, like Ms. Gillespie, to receive a certain amount of crack cocaine for every sale of crack the petitioner made to

30

another person. In addition to making a very detailed proffer of this evidence, the record shows the State informed the trial court that both Ms. Gillespie and Mr. Osborne were available to testify, if necessary. The State further reminded the court that Ms. Gillespie had testified during the hearing on the petitioner's motion to suppress the evidence seized from her residence at the time of his arrest and that all three 404(b) witnesses had given statements which were in the court record and had been provided to the petitioner's counsel.

Following the State's proffer, the trial court verified that the statements upon which the proffer was based were given to the petitioner's counsel in discovery. After individually discussing each of the proposed witnesses, the court explained its reasons for finding that the evidence was admissible pursuant to certain specified purposes under Rule 404(b).[16] The court then conducted the 404(b) balancing test and concluded that the

---

[16] The court found, specifically, that Mr. Osborne would be able to testify regarding the sales of crack cocaine by the petitioner that Mr. Osborne witnessed while the petitioner was staying in his home. The court found these transactions to be evidence of a common plan and scheme, and also showed intent or lack of mistake. Ms. Gillespie was similarly able to testify about the petitioner's sales of crack cocaine in her home, her purchase of crack cocaine from petitioner at Mr. Osborne's residence, and the threats the petitioner made to her. The court found her testimony concerning the drug transactions would constitute evidence of a common plan or scheme, as wells as intent or lack of mistake. With regard to the testimony about the petitioner's threats to kill her, the court found that it was admissible for the purpose of proving a consciousness of guilt or an attempt to avoid detection. Finally, the court found that Mr. Hurley would be able to testify regarding the transactions that took place when he was in Ms. Gillespie's home on January 21, 2011, for the purpose of establishing a common plan or scheme and intent or lack of mistake.

31

"probative value outweighed the prejudicial effect." Finally, the court noted that it would issue appropriate limiting instructions to the jury, which it ultimately did.

It is clear that the trial court completed all of the analytical steps necessary to determine the admissibility of the 404(b) evidence, and we find no error in the court's methodology for making that determination. As in *Bruffey*, the proffer made here was sufficient to allow the court to consider the similarities and differences between the charged and uncharged acts of the petitioner and conclude that the latter was proper 404(b) evidence which satisfied all the requirements for admissibility pursuant to *McGinnis*. Accordingly, we find no merit to the petitioner's argument.

## IV. Conclusion

Having found no merit to the petitioner's assignments of error for the reasons discussed above, the final order of the Circuit Court of Logan County entered on November 9, 2012, is affirmed.

Affirmed.

32