IN THE SUPREME COURT OF APPEALS OF WEST VIRGINIA

September 2016 Term

No. 15-0289

**FILED**

**October 19, 2016**

**released at 3:00 p.m.**
RORY L. PERRY, II CLERK
SUPREME COURT OF APPEALS
OF WEST VIRGINIA

STATE OF WEST VIRGINIA,
Plaintiff Below, Respondent

v.

ENNIS C. PAYNE II,
Defendant Below, Petitioner

Appeal from the Circuit Court of Harrison County
Honorable James A. Matish, Judge
Criminal Action No. 13-F-112-3

AFFIRMED

Submitted: September 20, 2016
Filed: October 19, 2016

Jason T. Gain, Esq.
Gain Law Offices
Bridgeport, West Virginia
Landon Moyer, Esq.

Cooper Law Offices
Bridgeport, West Virginia
Counsel for the Petitioner

Patrick Morrisey, Esq.
Attorney General
Shannon Frederick Kiser, Esq.
Assistant Attorney General

Charleston, West Virginia
Counsel for the Respondent

JUSTICE LOUGHRY delivered the Opinion of the Court.

# SYLLABUS BY THE COURT

1. "In contrast to a review of the circuit court's factual findings, the ultimate determination as to whether a search or seizure was reasonable under the Fourth Amendment to the United States Constitution and Section 6 of Article III of the West Virginia Constitution is a question of law that is reviewed *de novo*. . . . Thus, a circuit court's denial of a motion to suppress evidence will be affirmed unless it is unsupported by substantial evidence, based on an erroneous interpretation of the law, or, based on the entire record, it is clear that a mistake has been made." Syl. Pt. 2, in part, *State v. Lacy*, 196 W.Va. 104, 468 S.E.2d 719 (1996).

2. "When reviewing a ruling on a motion to suppress, an appellate court should construe all facts in the light most favorable to the State, as it was the prevailing party below. Because of the highly fact-specific nature of a motion to suppress, particular deference is given to the findings of the circuit court because it had the opportunity to observe the witnesses and to hear testimony on the issues. Therefore, the circuit court's factual findings are reviewed for clear error." Syl. Pt. 1, *State v. Lacy*, 196 W.Va. 104, 468 S.E.2d 719 (1996).

3. "'Where a person voluntarily and knowingly consents to a search of his premises, such a search may be conducted in the absence of a search warrant.' Syllabus

i

Point 1, *State v. Basham*, 159 W.Va. 404, 223 S.E.2d 53 (1976)." Syl. Pt. 1, *State v. Hambrick*, 177 W.Va. 26, 350 S.E.2d 537 (1986).

4. "The State and Federal Constitutions prohibit only unreasonable searches and seizures and there are numerous situations in which a search and seizure warrant is not needed, such as . . . property that has been abandoned, as well as searches and seizures made that have been consented to." Syl. Pt. 1, in part, *State v. Angel*, 154 W.Va. 615, 177 S.E.2d 562 (1970).

5. "'The Fourth Amendment of the *United States Constitution*, and Article III, Section 6 of the *West Virginia Constitution* protect an individual's reasonable expectation of privacy.' Syl. Pt. 7, *State v. Peacher*, 167 W.Va. 540, 280 S.E.2d 559 (1981)." Syl. Pt. 1, *Wagner v. Hedrick*, 181 W.Va. 482, 383 S.E.2d 286 (1989).

6. "Both the Fourth Amendment to the United States Constitution and Article III, Section 6 of the West Virginia Constitution provide that no warrant shall issue except upon probable cause supported by oath or affirmation." Syl. Pt. 3, *State v. Adkins*, 176 W.Va. 613, 346 S.E.2d 762 (1986).

7. "Probable cause for the issuance of a search warrant exists if the facts and circumstances provided to a magistrate in a written affidavit are sufficient to warrant the

belief of a prudent person of reasonable caution that a crime has been committed and that the specific fruits, instrumentalities, or contraband from that crime presently may be found at a specific location. It is not enough that a magistrate believes a crime has been committed. The magistrate also must have a reasonable belief that the place or person to be searched will yield certain specific classes of items. There must be a nexus between the criminal activity and the place or person searched and thing seized. The probable cause determination does not depend solely upon individual facts; rather, it depends on the cumulative effect of the facts in the totality of circumstances." Syl. Pt. 3, *State v. Lilly*, 194 W.Va. 595, 461 S.E.2d 101 (1995).

8. "A search warrant affidavit is not invalid even if it contains a misrepresentation, if, after striking the misrepresentation, there remains sufficient content to support a finding of probable cause. Probable cause is evaluated in the totality of the circumstances." Syl. Pt. 2, *State v. Lilly*, 194 W.Va. 595 461 S.E.2d 101 (1995).

9. "'To warrant a change of venue in a criminal case, there must be a showing of good cause therefor, the burden of which rests on the defendant, the only person who, in any such case, is entitled to a change of venue. The good cause aforesaid must exist at the time application for a change of venue is made. Whether, on the showing made, a change of venue will be ordered, rests in the sound discretion of the trial court; and its ruling thereon will not be disturbed, unless it clearly appears that the discretion aforesaid has been abused.'

Syl. pt. 2, *State v. Wooldridge*, 129 W.Va. 448, 40 S.E.2d 899 (1946)." Syl. Pt. 2, *State v. Williams*, 172 W.Va. 295, 305 S.E.2d 251 (1983).

10. "Widespread publicity, of itself, does not require change of venue, and neither does proof that prejudice exists against an accused, unless it appears that the prejudice against him is so great that he cannot get a fair trial." Syl. Pt. 1, *State v. Gangwer*, 169 W.Va. 177, 286 S.E.2d 389 (1982).

11. "One of the inquiries on a motion for a change of venue should not be whether the community remembered or heard the facts of the case, but whether the jurors had such fixed opinions that they could not judge impartially the guilt or innocence of the defendant." Syl. Pt. 3, *State v. Derr*, 192 W.Va. 165, 451 S.E.2d 731 (1994).

12. "Whether a change of venue is warranted rests in the sound discretion of the trial court, and its ruling thereon will not be disturbed, unless it clearly appears that such discretion has been abused." Syl. Pt. 2, *State v. Gangwer*, 169 W.Va. 177, 286 S.E.2d 389 (1982).

13. "A criminal defendant has the right under the Due Process Clause of our State and Federal Constitutions not to be forced to trial in identifiable prison attire." Syl. Pt. 2, in part, *State ex rel. McMannis v. Mohn*, 163 W.Va. 129, 254 S.E.2d 805 (1979).

14. "A criminal defendant has the right, absent some necessity relating to courtroom security or order, to be tried free of physical restraints." Syl. Pt. 3, *State v. Brewster*, 164 W.Va. 173, 261 S.E.2d 77 (1979).

LOUGHRY, Justice:

The petitioner, Ennis C. Payne II, appeals the January 29, 2015, order of the Circuit Court of Harrison County through which he was sentenced to life imprisonment with mercy for his first degree murder conviction to be followed by one to five years imprisonment for his conspiracy to commit burglary conviction. Seeking to set aside his convictions, the petitioner challenges the denial of his motions to suppress evidence and to change venue; his appearance in the courtroom in jail attire and restraints during jury voir dire; and cumulative error. Following a careful review of the briefs, the arguments of counsel, the record submitted, and the applicable law, this Court finds no reversible error and affirms the petitioner's convictions.

## I. Facts and Procedural Background[1]

In the early fall 2012, the petitioner and Darnell Bouie were arrested in connection with the death of Jayar Poindexter. On May 7, 2013, a Harrison County grand jury returned indictment No. 13-F-112-3 charging the petitioner[2] with first degree murder in

---

[1]The facts and procedural background as set forth herein have been gleaned from the transcripts of the suppression hearings and trial.

[2]Also charged in the indictment was Darnell Bouie. Bouie's trial occurred in the Spring of 2014. This Court affirmed Bouie's felony-murder and conspiracy to commit burglary convictions in *State v. Bouie*, 235 W.Va. 709, 776 S.E.2d 606 (2015).

1

violation of West Virginia Code § 61-2-1 (2014)[3] and conspiracy to commit burglary in violation of West Virginia Code §§ 61-3-11 (2014)[4] and §61-10-31 (2014).[5]   They were tried separately.[6]  The petitioner's trial occurred over the course of five days in November 2014 during which the State proceeded on a theory of felony-murder with the predicate felony being the conspiracy to commit burglary.  The State presented the testimony of thirty-

[3]West Virginia Code § 61-2-1 provides, in part:

> Murder by poison, lying in wait, imprisonment, starving, or by any willful, deliberate and premeditated killing, or in the commission of, or attempt to commit, arson, kidnapping, sexual assault, robbery, burglary, breaking and entering, escape from lawful custody, or a felony offense of manufacturing or delivering a controlled substance as defined in article four, chapter sixty-a of this code, is murder of the first degree.

[4]West Virginia Code § 61-3-11 provides, in part:

> (a)  Burglary shall be a felony and any person convicted thereof shall be confined in the penitentiary not less than one nor more than fifteen years. If any person shall, in the nighttime, break and enter, or enter without breaking, or shall, in the daytime, break and enter, the dwelling house, or an outhouse adjoining thereto or occupied therewith, of another, with intent to commit a crime therein, he shall be deemed guilty of burglary.

[5]West Virginia Code § 61-10-31 provides, in part:

> It shall be unlawful for two or more persons to conspire (1) to commit any offense against the State if . . . one or more of such persons does any act to effect the object of the conspiracy.
> . . . .
> Any person who violates the provisions of this section by conspiring to commit an offense against the State which is a felony . . . shall be guilty of a felony.

[6]*See* n.2, *supra.*

2

two witnesses and seventy-three of its exhibits were admitted into evidence.[7] The petitioner

presented the testimony of one witness, and his five exhibits were admitted into evidence.

The petitioner did not testify.

The evidence at trial demonstrated that during the evening of January 12, 2010,

Darnell Bouie, Michael Thomas, and Michael Moran traveled to the Ordinary Bar in

Clarksburg, West Virginia. At approximately 12:51 a.m. on January 13, 2010, security

cameras in the area captured the petitioner, Ennis Payne, entering the same bar. At that time,

he was wearing a Pittsburgh Pirates "P" baseball hat and dark Timberland-type boots.

Around 3:00 a.m., the petitioner, Bouie, Moran, and Thomas left the Ordinary

Bar traveling in two vehicles, a car belonging to Thomas and a truck that Leonard Hickey

had loaned to Bouie that evening at the Ordinary Bar. Although Hickey had left the bar

earlier that evening, he later rejoined the group, after which the men traveled in the two

vehicles to the Quarry Apartments located on Overlook Drive in Clarksburg, West Virginia.

After arriving at the Quarry Apartments, where the victim resided, the petitioner and Bouie

exited the vehicles, while the other men waited inside the vehicles for their return. Moran

---

[7]The State's exhibits included various photographs of the crime scene, surveillance videos, screen shots taken from surveillance videos, shoe castings taken at the crime scene, the .25 caliber bullet taken from the victim, the .25 caliber casing found at the crime scene, an ammunition magazine containing four .25 caliber cartridges, and other evidence, as discussed *infra*.

testified that after waiting for some time, he exited Thomas' car to see where the petitioner and Bouie had gone but, after walking for only a few seconds, he saw the petitioner and Bouie walking quickly back to the vehicles.

Jennifer Hall, the victim's girlfriend at the time of his death, testified that she had been asleep in bed on the night in question when she awoke to find the victim and another person, whom she could not see, struggling at the bedroom window. She stated that the victim stopped struggling and fell to the floor in a "frog-like" position.[8] In an effort to conceal herself, Ms. Hall hid on the floor near the bottom of the bed. Her call to 911 was made at 3:30 a.m. that morning. She testified that she did not alter the crime scene or anything else in the apartment prior to the arrival of the Clarksburg Police. The victim died of a gunshot wound to his chest.[9]

Officers responded to the crime scene. Photographs and cast molds were taken of footprints[10] discovered in the snow leading both to and from the victim's bedroom

---

[8]Hall testified at trial that she could not recall either seeing a gun or hearing a gunshot.

[9]One of the petitioner's relatives testified that the petitioner came to see him a couple of days after the murder; that the petitioner told him that he shot the victim in a "robbery gone bad"; that he did not think anyone was home at the victim's apartment; and that someone "ended up dead." When asked whether the petitioner had indicated the purpose of the robbery, the relative stated, "Money, drugs, money, I don't know."

[10]Surveillance video footage showed that Bouie was the only person in the group wearing sneakers on the night in question. An expert witness for the State identified one of
(continued...)

4

window.[11] Photographs were also taken of the victim's bedroom window, which the officers discovered half-raised with the screen "cut or torn." A .25 caliber casing was recovered at the scene. Later that day, a resident of the apartment complex informed police that he had observed a Pittsburgh Pirates "P" baseball hat on the grounds of the apartment complex around 7:30 a.m. that morning. The police recovered the hat. Surveillance video taken prior to the crime on January 13, 2010, showed the petitioner near the Quarry Apartments wearing a baseball cap.

The evidence at trial showed that after the petitioner and the other men left the Quarry Apartments, they traveled to a nearby Go-Mart, where security cameras captured their arrival at 3:35 a.m. The gas station video depicts the petitioner wearing what appears to be dark boots and a jacket with white stripes, but without the Pittsburgh Pirates hat that area surveillance cameras had captured him wearing earlier that evening. Thereafter, the petitioner was dropped off at the home of his friend, Timothy Starks, where Starks resided with his wife and children. The petitioner had been staying "off and on" in the first floor

---

[10](...continued)
the sets of footprints as belonging to a Nike tennis shoe.

[11]The petitioner's trial counsel stated during closing arguments that Moran killed the victim, citing Moran's ownership of footwear within one size of the petitioner's shoe size and similar to the footprints found outside the victim's bedroom window. The petitioner's counsel also noted the possible presence–as documented in police photographs–of a cigarillo filter on the victim's exterior windowsill. Both Moran and the petitioner were known to smoke cigarillos.

"living room area" of Starks' home over a fairly short period of time, "crashing there when he needed to."[12]   Starks testified that when the petitioner arrived around 4:00 a.m. that morning, the petitioner was carrying two guns.  When Starks awoke later that morning, the petitioner was gone without any indication as to whether he would return.  The petitioner left behind a cell phone and a Carhartt-type jacket[13] slung over a chair in the foyer of the first floor living area of Starks' home.

On January 15, 2010, Clarksburg Police Officer Mike Fazzini[14] went to Starks' home[15] to inquire as to the petitioner's whereabouts.  Starks did not know where the petitioner was, but asked whether he should keep or dispose of the petitioner's Carhartt jacket that the petitioner had left behind on a chair in the foyer of Starks' home.  Fazzini told Starks that he should "hang onto" the jacket and then contacted Detective Wygal, who came to Starks' residence.  Thereafter, Starks signed a consent-to-search form for the first floor living, kitchen, and downstairs bathroom of his home.  Upon executing the search, Starks

---

[12]This particular testimony was given by Starks during a suppression hearing.

[13]This jacket is referred to as both a "Carhartt jacket" and a "Carhartt-type jacket." For ease of reference, we refer to it as either a "Carhartt jacket" or "jacket" for purposes of this opinion.

[14]Because nearly five years passed between the victim's murder and the petitioner's trial, many officers with the Clarksburg Police Department had changed ranks or jobs. For purposes of this opinion, we use their ranks and titles at the time of the victim's murder.

[15]The record indicates that Fazzini and Starks were friends, having known each other since childhood.

confirmed that the Carhartt jacket on a chair in the foyer of the lower living area belonged to the petitioner. Inside a jacket pocket, Fazzini found an ammunition magazine containing four .25 caliber cartridges and court documents bearing the petitioner's name. The officers seized the jacket and its contents.

On January 24, 2010, Clarksburg Police Sergeant Joshua Cox, the lead detective on the case, filed an Affidavit and Complaint for Search Warrant (hereinafter "affidavit") for a "white one story residence" located at 118 Anderson Street, Clarksburg, West Virginia, which is where the petitioner resided.[16] The items sought by Sergeant Cox were a "black jacket with white stripes on the sleeve and white stripes around the collar, boots or shoes, and any .25 caliber firearm, .25 caliber ammunition or container, knife, box cutter, cell phone, pager, any clothing bearing blood stains and any gray shirts." A circuit court judge issued the search warrant and, during the execution of the warrant, officers discovered and seized, among other items, two pairs of Timberland boots–one black pair (size 10.5) and one tan pair (size 8.5)–and a pair of white Nike tennis shoes (size 9). During trial, an expert for the State testified that the petitioner's size 10.5 Timberland boots fit the

[16]When questioned during a suppression hearing as to how he knew the petitioner's address, Sergeant Cox testified, as follows:

> Q. How were you aware that 118 Anderson Street was, in fact, the residence of the defendant?
> A. Because I've known E.C. [Ennis Payne] practically all of my life and also we - - I ran his driver's license or his ID number and it came back to 118 Anderson Street.

7

impression of the boot taken at the crime scene, although he could not determine whether the petitioner's boots actually made the impression given the absence of any individual features in either the boots or the impression.

In November 2010, Sergeant Cox traveled to a federal correctional facility[17] to execute a search warrant for the petitioner's DNA[18] and to ascertain the petitioner's foot size. Sergeant Cox advised the petitioner that his DNA was being obtained to compare it to DNA recovered from the Pittsburgh Pirates hat found at the Quarry Apartments. The petitioner admitted the hat belonged to him, but added that other persons also wore the hat. While Sergeant Cox was measuring the petitioner's foot, the petitioner volunteered that he wore a "ten something."

During pretrial hearings held on February 12 and 18, 2014, the trial court received evidence on the petitioner's motions to suppress the Carhartt jacket and the ammunition magazine, which had been seized at Starks' residence, as well as the evidence seized during the execution of the search warrant at the petitioner's home. Sergeant Cox recited the evidence recovered at the crime scene, the images that had been captured on the

[17]The petitioner was incarcerated in the facility on unrelated federal firearms charges.

[18]Investigators wanted a sample of the petitioner's DNA to compare with DNA that was taken from the shoes seized at the petitioner's home and from the Pittsburgh Pirates hat recovered at the Quarry Apartments.

8

night in question by various surveillance cameras, and the evidence recovered through the execution of the search warrant at the petitioner's residence, including boots and tennis shoes.[19] Sergeant Cox testified that his affidavit seeking the search warrant for the petitioner's residence contained facts within his personal knowledge and was based upon probable cause. Officer Fazzini and Detective Wygal testified regarding their search of the first floor of Starks' home with Starks' written consent during which the petitioner's Carhartt jacket and the .25 caliber ammunition magazine were found. Starks' testimony corroborated that given by Fazzini and Wygal, including his consent to the search of his residence.

By order entered on May 16, 2014, the trial court denied the petitioner's motions to suppress. Regarding the evidence seized at Starks' residence, the trial court found that Starks had authority to consent to the search of the first floor of his home where the petitioner had stayed and where the jacket and ammunition magazine were found. Regarding the evidence seized from the petitioner's residence, the trial court found that under the totality of the circumstances, particularly the surveillance video that placed the petitioner near the victim's residence at the time he was murdered, there was sufficient information in Sergeant Cox's affidavit to support a finding of probable cause for the issuance of the search warrant.

---

[19]Sergeant Cox also described telephone communications made by the petitioner while he was incarcerated at the North Central Regional Jail during which he threatened witnesses, including Starks, who confirmed the threat during his testimony.

The record reflects that throughout this criminal proceeding, the petitioner refused to appear in court for hearings and other proceedings, refused to leave his jail and/or courthouse holding cell,[20] refused to meet with his counsel, and made threats towards his counsel and their families, as well as witnesses.[21] He also previously threatened courtroom security [22] when he indicated that if he did not get want he wanted, he would grab a deputy's

[20]During a pre-trial hearing held on May 27, 2014, the trial judge observed

> Well, there has been a history of Mr. Payne . . . refusing to come out of his cell, refusing to appear in court, and as the Court recalls at least on one occasion, he battered an inmate, I hear, in the holding facility when he was scheduled for a court appearance in this case.

[21]The petitioner repeatedly sought new counsel, which resulted in four attorneys being removed from his case, new counsel being appointed, and five trial dates being continued. The petitioner also filed several pro se motions requesting new counsel, claiming counsel had a conflict of interest because he had threatened their lives and the lives of their families.

[22]An example of the petitioner's recalcitrance and disrespect is reflected in the following exchange that took place during the May 27, 2014, pre-trial hearing after defense counsel advised the trial court that the petitioner did not wish to proceed in court that day:

> Judge: Any suggestions you [defense counsel] have to resolve this matter?
> Defense Counsel: . . . My primary concern is that Mr. Payne receive a fair trial.
> Judge: Well, that the Court's concern and that's been the Court's concern all along. And the Court's advised Mr. Payne previously on the record that he's his own worst enemy, that he needs to cooperate with his attorney.
> Petitioner: Motherf--ker, I have been cooperating with my Goddamn attorney.
> Judge: Mr. Payne, you be quiet.
> Petitioner: I ain't got to hear that shit. I'll say what the f--k I want.

(continued...)

10

gun.[23]  Based on this history, the trial judge advised the petitioner, immediately before jury

voir dire began on November 3, 2014, as follows:

> Mr. Payne, the Court is obviously concerned with some of the actions that have taken place here, and some of the comments that have been made by you.  However, the Court is going to do something that it hasn't done before, and that is I'm going to sign an order directing that in order to preserve your fair - - your right to a fair trial and have you not appear in orange or in leg shackles or handcuffs, I'm going to sign an order directing that what's known as locomotion restrictive humane leg restraints be put on, and they be put on underneath

---

[22](...continued)
> Judge:  You be quiet.
> Petitioner:  Whatever.
> Judge:  You be quiet.
> Petitioner:  What are you going to do throw me in jail?
> Judge:  Sir, I told you to be quiet and I expect you to be quiet and let your attorney talk.
> Petitioner:  You going to put me in jail?
> Judge:  I'll address you in a minute.
> Petitioner:  Raising your voice don't mean nothing. It just means you lose control.
> Judge:  I am in control, sir.
> Petitioner:  You ain't in control of nothing. You just talking cause you got a pair of lips.

[23]The petitioner articulated this threat during a telephone call that he made from the regional jail.  During the May 27, 2014, pre-trial hearing, Sergeant Graeber, the officer charged with courtroom security, proffered the following opinion when the trial judge asked whether he believed the petitioner posed a security risk:

> Sgt. Graeber: I think it's obviously a concern of mine and my deputies knowing that he has nothing to lose at this point; that if he's made threats to grab a deputy's weapon[,] it's a danger to everybody in this courtroom and the general public of Harrison County who is visiting the building. There may be an issue with safety concerns.

your street clothing so that the jury cannot see or have any idea that those are being used.

However, in the event that you do not cooperate with those devices being installed, or if you refuse to change in[to] street clothes, then the Court will direct the bailiffs to bring you to the courtroom for the jury trial in jail clothing and shackles and handcuffs, which will remain on throughout the trial.

• • • •

So the choice is yours at this point in time. The Court's tried to accommodate you as much as what it can. But this case is going to trial, and hopefully you'll realize, as the Court's told you in the past, that the only person you're going to be hurting is yourself.

The petitioner was then placed in the custody of the bailiff to allow him to put on the humane restraints and street clothes. Soon thereafter, the petitioner's counsel reported to the trial court that counsel had met with the petitioner, who refused to change into the street clothes and the humane restraints that were made available to him. Counsel further stated that when he advised the petitioner that he should do so, the petitioner responded that he "wo[uld]n't be up there for long," which counsel interpreted as the petitioner's intent "to try to create some chaos" when he came into the courtroom. Upon receiving this information, the trial judge stated, as follows:

The defendant has left this Court with no choice but based upon his attitude, his demeanor, comments he's made, and his actions, refusing to come out of his cell on occasion, refusing to be brought to hearings, refusing to meet with his counsel, and his now refusal to change into street clothes. This is not the first time that the defendant has done this with the case set for trial. The Court is left with no choice but to have him brought to the courtroom in his jail clothing with shackles and handcuffs . . . .

12

Thereafter, the petitioner was brought into the courtroom wearing jail attire, shackles, and handcuffs, and the jury voir dire began. The trial judge admonished the jury venire with the following instruction:

> Ladies and gentlemen of the jury, you will note that the defendant is in jailhouse clothing and handcuffs and shackles. The reason for this is of no concern to you, and shall not be considered by you for any reason in arriving at your verdict in this case.
>
> In fact, you shall not discuss this aspect of the case at any time during your deliberations. The defendant is presumed under the law to be innocent of all charges, and the only way the defendant can be convicted of anything is if the State of West Virginia produces sufficient evidence by the testimony of witnesses and/or various exhibits to prove beyond a reasonable doubt each and every element of the offenses charged. Then and only then, may you find the defendant guilty of any offense.
>
> Again, you are to make no reference nor speculate as to why the defendant may be in custody at this time.
>
> Do each of you understand and agree that you will give no consideration to his appearance in this case in arriving at your verdict if you are selected to serve on the jury for the trial of this case?

The entire jury pool answered in the affirmative.

Several months prior to jury voir dire, the petitioner had filed a motion for a change of venue due to pre-trial publicity.[24] The State opposed the motion, asserting the petitioner had failed to put forth any evidence, other than stories reported in local media, that "there exists in this County a prejudice against [the petitioner] so great that he cannot obtain

---

[24]The appendix record includes several news articles regarding the murder.

13

a fair and impartial trial in this County," or that "a present hostile sentiment exists against [the petitioner], extending throughout the entirety of Harrison County." The trial court deferred ruling on the motion until jury selection. During voir dire, when questioned regarding their prior knowledge of the case, only two members of the jury pool indicated they had some prior knowledge based on news coverage; both stated they had formed no opinion of the case, nor could they recall specific information derived from the news articles.[25]

Following the presentation of evidence, the jury returned its verdict finding the petitioner guilty of first degree murder with a recommendation of mercy and conspiracy to commit burglary. The petitioner directed his counsel not to file a post-trial motion for a new trial.[26] This appeal followed.

## II. Standard of Review

---

[25]One of these two jurors was selected to sit on the petitioner's jury.

[26]Notwithstanding the failure to move for a new trial, we find the errors assigned were fully developed, carefully considered, and ruled upon by the trial court during pre-trial proceedings below. Accordingly, we will address the same. *See* Syl. Pt. 4, *State v. Jessie*, 225 W.Va. 21, 689 S.E.2d 21 (2009) ("Although this Court has held that a defendant may not assign an error for the first time on appeal that could have been presented initially for review in a post-trial motion, failure to raise an issue in a post-trial motion will not prevent this Court from entertaining that issue on appeal where it is clear that the trial court carefully and completely considered that specific issue in a pre-trial motion.").

14

The petitioner assigns errors that involve varying standards of review. Accordingly, we will set forth those standards in our discussion of each issue as we proceed to determine whether the petitioner is entitled to relief from his convictions.

## III. Discussion

The petitioner seeks to overturn his convictions on grounds related to the denial of his motions to suppress evidence and to change venue, as well as his appearance in restraints and jail attire during jury voir dire. We address each of these assignments of error, in turn, below.

## A. Search and Seizure

The petitioner asserts the trial court erred by refusing to suppress the evidence seized during the police search of Starks' residence with Starks' consent. Citing *United States v. Matlock*, 415 U.S. 164 (1974), the petitioner argues that consent to search an item of personal property can only be given by someone with "common authority" over, or other sufficient relationship with, the item to be inspected, and that any notion that he abandoned his jacket would eviscerate the principles announced in *Matlock*. Maintaining that Starks was neither a user nor possessor of the jacket at the time it was searched, the petitioner contends that while the police could observe the jacket and notice things in plain view, the officers exceeded the scope of the consent search and trespassed upon his jacket by seizing items from a pocket of the jacket, rendering such evidence inadmissible at trial.

15

Relying upon *State v. Dorsey*, 234 W.Va. 15, 762 S.E.2d 584 (2014), the State asserts there was no error because an overnight guest has a privacy interest when staying in another's home against everyone but the host and those whom the host permits to enter his or her home. The State asserts the petitioner abandoned any privacy interest he had in his jacket by leaving it behind in a common area of Starks' home with no indication that he ever planned to return or to retrieve it. Thus, the State maintains that any expectation of privacy the petitioner maintained in his jacket had already been forfeited by him at the time Starks consented to the search of his residence.

In determining whether the seizure of the petitioner's jacket and its contents was constitutionally reasonable and whether the circuit court correctly denied the petitioner's motion to suppress the evidence recovered from the jacket, our standard of review is plenary:

> In contrast to a review of the circuit court's factual findings, the ultimate determination as to whether a search or seizure was reasonable under the Fourth Amendment to the United States Constitution and Section 6 of Article III of the West Virginia Constitution is a question of law that is reviewed *de novo*. . . . Thus, a circuit court's denial of a motion to suppress evidence will be affirmed unless it is unsupported by substantial evidence, based on an erroneous interpretation of the law, or, based on the entire record, it is clear that a mistake has been made.

Syl. Pt. 2, in part, *State v. Lacy*, 196 W.Va. 104, 468 S.E.2d 719 (1996). We have also observed that

> [w]hen reviewing a ruling on a motion to suppress, an appellate court should construe all facts in the light most

16

favorable to the State, as it was the prevailing party below. Because of the highly fact-specific nature of a motion to suppress, particular deference is given to the findings of the circuit court because it had the opportunity to observe the witnesses and to hear testimony on the issues. Therefore, the circuit court's factual findings are reviewed for clear error.

*Id.* at 107, 468 S.E.2d at 722, syl. pt. 1.

While the United States Supreme Court has recognized that an overnight guest has a legitimate expectation of privacy in a host's home, the Court also observed that "[f]rom the overnight guest's perspective, . . . his possessions will not be disturbed by anyone but his host *and those his host allows inside*." *Minnesota v. Olson*, 495 U.S. 91, 99 (1990) (emphasis added). Courts have found, based on this observation in *Olson*, that an overnight guest cannot challenge a search and seizure under the Fourth Amendment when their host has consented to the police search. *See, e.g., United States v. Isom*, 588 F.2d 858 (2d Cir.1978) (finding no violation of defendant's Fourth Amendment rights where owner consented to search of home in which defendant stayed intermittently); *Wigley v. State*, 44 S.W.3d 751, 754 (Ark. Ct. App. 2001) (finding defendant, as overnight guest in home, did not have reasonable expectation of privacy because "an overnight guest has no reasonable expectation of privacy when the host consents to the search").

Here, Starks voluntarily consented to a police search of the first floor of his home. "'Where a person voluntarily and knowingly consents to a search of his premises,

17

such a search may be conducted in the absence of a search warrant.' Syllabus Point 1, *State v. Basham*, 159 W.Va. 404, 223 S.E.2d 53 (1976)." Syl. Pt. 1, *State v. Hambrick*, 177 W.Va. 26, 350 S.E.2d 537 (1986). Further, "[t]he State and Federal Constitutions prohibit only unreasonable searches and seizures and there are numerous situations in which a search and seizure warrant is not needed, such as . . . property that has been abandoned, as well as searches and seizures made that have been consented to." Syl. Pt. 1, in part, *State v. Angel*, 154 W.Va. 615, 177 S.E.2d 562 (1970).

Because "Fourth Amendment rights are personal rights [that] . . . may not be vicariously asserted[,]"[27] "we must begin our analysis by first determining whether the petitioner has standing to make a claim for violation of his rights under the Fourth Amendment and Section 6 of Article III of the West Virginia Constitution as a result of the search and seizure of evidence from [Starks'] residence." *Dorsey*, 234 W.Va. at 21, 762 S.E.2d at 590. "'The Fourth Amendment of the *United States Constitution*, and Article III, Section 6 of the *West Virginia Constitution* protect an individual's reasonable expectation of privacy.' Syl. Pt. 7, *State v. Peacher*, 167 W.Va. 540, 280 S.E.2d 559 (1981)." Syl. Pt. 1, *Wagner v. Hedrick*, 181 W.Va. 482, 383 S.E.2d 286 (1989). In this regard, we have recognized that "[a] claim of protection under the Fourth Amendment and the right to challenge the legality of a search depends not upon a person's property right in the invaded

---

[27]*Alderman v. United States*, 394 U.S. 165, 174 (1969).

18

place or article of personal property, but upon whether the person has a legitimate expectation of privacy in the invaded place or thing." *Hedrick*, 181 W.Va. at 487, 383 S.E.2d at 291 (citing *Katz v. United States*, 389 U.S. 347, 353 (1967)). Consequently, "if a person is in such a position that he cannot reasonably expect privacy, a court may find that an unreasonable Fourth Amendment search has not taken place." *Hedrick*, 181 W.Va. at 487, 383 S.E.2d at 291.

With specific regard to the seizure of the petitioner's jacket and its contents, which he left behind in Starks' home, we observe that

> [t]he touchstone of Fourth Amendment analysis is whether a person has a "constitutionally protected reasonable expectation of privacy." *Katz v. United States*, 389 U.S. 347, 360, 88 S.Ct. 507, 516, 19 L.Ed.2d 576 (1967) (Harlan, J., concurring). *Katz* posits a two-part inquiry: first, has the individual manifested a subjective expectation of privacy in the object of the challenged search? Second, is society willing to recognize that expectation as reasonable?

*California v. Ciraolo*, 476 U.S. 207, 211 (1986). Under this two-party inquiry, our analysis does not turn on whether the petitioner retained an ownership interest in the jacket, but whether he retained a reasonable expectation of privacy in the jacket and its contents. Critically, the petitioner "b[ore] the burden of proving not only that the search of [his jacket] was illegal, but also that he had a legitimate expectation of privacy in that [jacket]." *Rawlings v. Kentucky*, 448 U.S. 98, 104 (1980); *see also Rakas v. Illinois*, 439 U.S. 128, 131

19

n.1 (1978) ("The proponent of a motion to suppress has the burden of establishing that his own Fourth amendment rights were violated by the challenged search and seizure.").

Relying upon *Matlock*,[28] the petitioner asserts that Starks could consent to the search of his own home, but not to the search of the petitioner's jacket. The petitioner relies upon cases addressing whether a person could consent to the search of the interior of a closed item that belonged to someone else, such as a briefcase found in the locked trunk of a vehicle[29] and a footlocker located in the defendant's bedroom.[30] However, the relevant inquiry is not whether the pocket of the petitioner's jacket is a closed "container," but whether the petitioner had a reasonable expectation of privacy in the jacket at the time of the search and seizure. As we recently explained,

> "one who asserts a Fourth Amendment violation must demonstrate a 'reasonable expectation of privacy' in the subject of the seizure. That expectation is to be measured both subjectively and by an objective standard of reasonableness." *Marano v. Holland*, 179 W.Va. 156, 163, 366 S.E.2d 117, 124 (1988). Thus, an expectation of privacy is legitimate when an individual demonstrates that he or she personally has an expectation of privacy in the place searched, and also demonstrates that the expectation is reasonable. *Rakas v. Illinois*, 439 U.S. 128, 143-44, 99 S.Ct. 421, 58 L.Ed.2d 387 (1978). In order for an expectation to be "reasonable" it must have "a source outside of the Fourth Amendment, either by reference to concepts of real or personal property law or to

---

[28]*United States v. Matlock*, 415 U.S. 164 (1974).

[29]*United States v. Infante-Ruiz*, 13 F.3d 498 (1st Cir. 1994).

[30]*United States v. Block*, 590 F.2d 535 (4th Cir. 1978).

20

understandings that are recognized and permitted by society." 439 U.S. at 143-144 n.12, 99 S.Ct. 421. In other words, the individual's subjective expectation of privacy must be "one that society is prepared to recognize as 'reasonable.'" *Id.*

*Dorsey*, 234 W.Va. at 22, 762 S.E.2d at 591.

In determining whether the petitioner met his burden of proving that he had a legitimate expectation of privacy in the jacket, we examine the evidence presented at the suppression hearing[31] through a "highly fact-specific" lens. *Lacy*, 196 W.Va. at 107, 468 S.E.2d at 722, syl. pt. 1, in part. Importantly, such facts are to be "construe[d] . . . in the light most favorable to the State." *Lacy*, 196 W.Va. at 107, 468 S.E.2d at 722, syl. pt. 1, in part.

Construing the facts of the case at bar in the light most favorable to the State, we find the petitioner failed in his burden of proving that he had a reasonable expectation of privacy in his jacket and, thus, lacks standing to challenge the search. The suppression hearing evidence demonstrated that Starks bailed the petitioner out of jail at the end of December of 2009,[32] after which the petitioner "just kind of hung out" with the Starks family

---

[31]*See State v. Buzzard*, 194 W.Va. 544, 552, 461 S.E.2d 50, 58 (1995) ("[T]here is no authority . . . that upon appellate review, we should consider the . . . testimony at trial in upholding the trial court's ruling which arose out of the pre-trial suppression hearing"); *State v. Farley*, 192 W.Va. 247, 253-54 n.7, 452 S.E.2d 50, 56-57 n.7 (1994) ("Because the defendant did not renew his motion to suppress at trial, specifically after he had testified, he is now foreclosed from using trial testimony to challenge the trial court's ruling.").

[32]This was less than two weeks before the victim's murder on January 13, 2010.

21

"a little bit," sometimes staying at Starks' house, or he might "stay with somebody else[,]" "crashing" at Starks' home "when he needed to." The evidence also showed that the petitioner arrived at Starks' home during the early morning hours of January 13, 2010, shortly after the murder. When Starks awoke later that same morning, the petitioner was gone, having relinquished possession of his jacket by leaving it in the foyer of the home, a common area. The petitioner gave Starks no indication as to whether he would ever return to Starks' home, and he left no instructions with regard to his jacket.

In short, the petitioner could not reasonably have expected that no one would ever touch or handle his jacket that he had abandoned on a chair in the foyer of Starks' home, whether it be Starks, or his wife or children, or people Starks invites into his home, such as Detective Wygal and Officer Fazzini. Other courts are in agreement that persons by their acts and deeds can lose any expectation of privacy in personal items. *See Brown v. United States*, 97 A.3d 92, 96 (D.C. 2014) (citing *United States v. Boswell*, 347 A.2d 270, 274 (D.C. 1975) ("'The issue is not abandonment in the strict property-right sense but whether the person prejudiced by the search had voluntarily discarded, left behind, or otherwise relinquished his interest in the property in question.'"); *Hill v. United States,* 664 A.2d 347 (D.C. 1995) (finding defendants did not have legitimate expectation of privacy in apartment where they "sometimes" stayed, where they had stayed previous night, and were good friends with tenant); *State v. Corbin*, 957 N.E.2d 849 (Ohio Ct. App. 2011) (finding defendant had no expectation of privacy in contents of bag he had abandoned in plain view at home of third-

22

party who consented to search of home where defendant was occasional overnight guest );

*State v. Francisco*, 26 P.3d 1008, 1012 (Wash. Ct. App. 2001) (upholding search and seizure of gun at mother's home and observing that "[defendant's] intermittent use of his mother's house as a place to stay overnight, do laundry, and store clothes does not suggest that he had authority to exclude anyone from the premises or that he could legitimately expect that items he left there would remain undisturbed.").

Under the specific facts and circumstances of the instant matter construed in the light most favorable to the State, we find no error in the admission of the evidence seized from Starks' home. Accordingly, we affirm the trial court's denial of the motion to suppress.

### B.  Probable Cause for Search Warrant

The petitioner asserts the trial court erred by denying his motion to suppress the evidence seized from his residence at 118 Anderson Street because the affidavit seeking the search warrant lacked a proper nexus between the criminal activity, the place searched, and the items sought. The petitioner argues that the sufficiency of the affidavit for the probable cause determination must be based solely on the facts within the four corners of the affidavit. He contends Sergeant Cox's affidavit contained no facts to connect 118 Anderson Street to any of the items or activities described therein; used knowledge of an uncorroborated hearsay informant regarding phone calls; contained a conclusory statement that the Pittsburgh Pirates hat found at the scene belonged to the petitioner; and failed to state

23

where and when the petitioner was seen wearing the hat.[33] For these reasons, the petitioner argues that the evidence seized pursuant to the search warrant, including a pair of size 10.5 Timberland boots, should have been suppressed at trial.

The State responds that the trial court correctly ruled that the evidence seized from within the petitioner's home was admissible at trial. The State asserts that reviewing courts should grant issuing courts deference when reviewing warrants for probable cause, judging such warrants under the totality of the circumstances. Regarding the statement in the affidavit that an individual said the petitioner endeavored to phone the victim on the night of the murder, the State maintains a search warrant is not invalidated merely because it contains a misrepresentation if, absent the misrepresentation, the balance of the affidavit supports a finding of probable cause. Arguing there was probable cause for the warrant to issue, the State cites the strong surveillance video evidence, as described in the affidavit, first depicting the petitioner wearing the Pirates hat and later showing him without the hat, combined with the fact that a Pirates hat was found at the crime scene. The State asserts that the lack of specific locations in the affidavit as to where the petitioner was seen with or without the hat "bears no weight as to probable cause." The State also notes that the affidavit stated the victim was murdered with a .25-caliber gun and that a .25-caliber gun magazine

---

[33]Although the petitioner also asserts the affidavit was deficient because it described the ammunition magazine seized from his jacket, we have already determined that the trial court was correct in refusing to suppress this evidence.

was found in the petitioner's jacket at a friend's residence. Lastly, the State asserts the affidavit sought "specific classes of items," which the surveillance video evidence indicated the petitioner possessed.

It is well-established that "[b]oth the Fourth Amendment to the United States Constitution and Article III, Section 6 of the West Virginia Constitution provide that no warrant shall issue except upon probable cause supported by oath or affirmation." Syl. Pt. 3, *State v. Adkins*, 176 W.Va. 613, 346 S.E.2d 762 (1986); *see also* W.Va.R.Crim.P. 41(c) ("A warrant shall issue only on an affidavit or affidavits sworn to before the magistrate or a judge of the circuit court and establishing the grounds for issuing the warrant. If the magistrate or circuit judge is satisfied that grounds for the application exist, or that there is probable cause to believe that they exist, that magistrate or circuit judge shall issue a warrant identifying the property or person to be seized and naming or describing the person or place to be searched. The finding of probable cause may be based upon hearsay evidence in whole or in part.").

In the instant matter, Sergeant Cox sought a warrant to search 118 Anderson Street, Clarksburg, West Virginia, based on the following information set forth in his affidavit:

On 01-13-10, around 0330 hrs, Jayar Poindexter was shot and killed with a .25 caliber gun at the Overlook Apts[34] in Harrison County. According to an individual, EC Payne had throughout the night attempted to make contact with the victim by phone. EC Payne's Pirate hat was located on the ground, across from the victim's residence. Surveillance video showed around 0300 hours EC Payne was wearing the hat. At 0336 hrs, EC Payne is observed at the Go Mart in Bridgeport without the hat. During a search of the coat belonging to EC Payne at a friend's residence, Officers recovered a .25 auto magazine containing bullets.

(Footnote added). In determining whether there was probable cause for the circuit court to issue the search warrant based upon this affidavit, we are guided by the following principles:

> Probable cause for the issuance of a search warrant exists if the facts and circumstances provided to a magistrate in a written affidavit are sufficient to warrant the belief of a prudent person of reasonable caution that a crime has been committed and that the specific fruits, instrumentalities, or contraband from that crime presently may be found at a specific location. It is not enough that a magistrate believes a crime has been committed. The magistrate also must have a reasonable belief that the place or person to be searched will yield certain specific classes of items. There must be a nexus between the criminal activity and the place or person searched and thing seized. The probable cause determination does not depend solely upon individual facts; rather, it depends on the cumulative effect of the facts in the totality of circumstances.

Syl. Pt. 3, *State v. Lilly*, 194 W.Va. 595, 461 S.E.2d 101 (1995). Further,

---

[34]The Quarry Apartments are located on Overlook Drive. Throughout this criminal proceeding, witnesses used the names "Overlook Apartments" and "Quarry Apartments" to refer to the same apartment complex.

[i]n *State v. Thomas*, 187 W.Va. 686, 421 S.E.2d 227 (1992), we quoted approvingly the standard of review of the sufficiency of a search warrant affidavit outlined by the United States Supreme Court in *Illinois v. Gates*, 462 U.S. 213, 103 S.Ct. 2317, 76 L.Ed.2d 527 (1983):

> [W]e have repeatedly said that after-the-fact scrutiny by the courts of the sufficiency of an affidavit should not take the form of de novo review. A magistrate's determination of probable cause should be paid great deference by reviewing courts. A grudging or negative attitude by reviewing courts toward warrants, is inconsistent with the Fourth Amendment's strong preference for searches conducted pursuant to a warrant; courts should not invalidate warrant[s] by interpreting affidavit[s] in a hypertechnical, rather than a commonsense, manner.

*State v. Corey*, 233 W.Va. 297, 303-04, 758 S.E.2d 117, 123-24 (2014).

Applying these standards, we find Sergeant Cox's affidavit established probable cause for the circuit court to issue the search warrant. While the petitioner characterizes the reference in the affidavit to the Pirates hat as being conclusory, the affidavit provides that this hat was discovered on the ground near the victim's apartment and that surveillance video captured the petitioner wearing a Pirates hat shortly before the murder, but not wearing it shortly after the murder. Further, even if we were to remove the statement concerning the petitioner attempting to call the victim on the night of the murder, we find the balance of the information in the affidavit was sufficient for the circuit court to find probable cause to issue the warrant. As we have previously held, "[a] search warrant affidavit is not invalid even if

27

it contains a misrepresentation, if, after striking the misrepresentation, there remains sufficient content to support a finding of probable cause. Probable cause is evaluated in the totality of the circumstances." Syl. Pt. 2, *State v. Lilly*, 194 W.Va. 595, 461 S.E.2d 101 (1995). The affidavit further provided that the victim was shot and killed with a .25 caliber gun and that officers had recovered a .25 caliber ammunition magazine from the jacket the petitioner left behind at a friend's home. Based upon the "cumulative effect of the facts in the totality of circumstances,"[35] and viewing the facts in the light most favorable to the prosecution, we find Sergeant Cox's affidavit contained ample information establishing probable cause for the circuit court's issuance of the search warrant. Accordingly, we find no error in the trial court's denial of the petitioner's motion to suppress the evidence seized during the execution of the warrant.

### C. Venue

The petitioner asserts the trial court erred by failing to grant his motion for a change of venue, alleging that newspaper articles and extensive media coverage was so prejudicial as to warrant either the removal of his trial to another county or a change of venire by summoning potential jurors from another county. Noting that West Virginia Code § 62-3-13 (2014) provides that "[a] court may, on the petition of the accused and for good cause shown, order the venue of the trial of a criminal case in such court to be removed to some

---

[35]*Lilly*, 194 W.Va. at 598, 461 S.E.2d at 104, syl. pt. 3, in part.

other county[,]" the petitioner asserts that "good cause shown" means the establishment of a "present, hostile sentiment" against the accused throughout the county in which the offense occurred, which precludes the defendant from receiving a fair trial. Although the petitioner concedes that prejudicial pre-trial publicity alone is insufficient to require a change of venue and that prejudice must be proven, he maintains that he suffered "substantial prejudice" due to "extensive and voluminous" media coverage in the community.

The State responds that the trial court correctly denied the motion as there was insufficient evidence to support a change of venue. Noting the burden of proof for any change of venue motion rests with the movant, the State maintains that the decision on whether to grant a change of venue should not be disturbed on appeal absent a clear abuse of discretion. The State points out that during voir dire, only two potential jurors recalled hearing news of the victim's murder or of the petitioner's arrest as a suspect; neither had formed an opinion of the case based upon the news articles; and neither could recall specific information derived from the news articles.

It has long been the law in this state that

> "[t]o warrant a change of venue in a criminal case, there must be a showing of good cause therefor, the burden of which rests on the defendant, the only person who, in any such case, is entitled to a change of venue. The good cause aforesaid must exist at the time application for a change of venue is made. Whether, on the showing made, a change of venue will be ordered, rests in the sound discretion of the trial court; and its

29

ruling thereon will not be disturbed, unless it clearly appears that the discretion aforesaid has been abused." Syl. pt. 2, *State v. Wooldridge*, 129 W.Va. 448, 40 S.E.2d 899 (1946).

Syl. Pt. 2, *State v. Williams*, 172 W.Va. 295, 305 S.E.2d 251 (1983). Importantly, "[w]idespread publicity, of itself, does not require change of venue, and neither does proof that prejudice exists against an accused, unless it appears that the prejudice against him is so great that he cannot get a fair trial." Syl. Pt. 1, *State v. Gangwer*, 169 W.Va. 177, 286 S.E.2d 389 (1982). Moreover, a change of venue will not be granted unless "a present hostile sentiment against the accused, extending throughout the entire county in which he is brought to trial[,]" is shown. Syl. Pt. 1, in part, *State v. Peacher*, 167 W.Va. 540, 280 S.E.2d 559 (1981) (quoting Syl. Pt. 1, *State v. Siers*, 103 W.Va. 30, 136 S.E. 503 (1927)).

Here, the trial court delayed ruling on the petitioner's motion for a change of venue until after jury voir dire, which ultimately proved unavailing to the petitioner. Indeed, "[o]ne of the inquiries on a motion for a change of venue should not be whether the community remembered or heard the facts of the case, but whether the jurors had such fixed opinions that they could not judge impartially the guilt or innocence of the defendant." Syl. Pt. 3, *State v. Derr*, 192 W.Va. 165, 451 S.E.2d 731 (1994). As the State points out, only two jurors had any recollection of news coverage of the matter and both indicated, unequivocally, that they had no fixed opinions regarding the matter.

30

Although the petitioner asserts that prejudicial newspaper articles were magnified by the low crime rate in his small community, the fact remains that even if he had been able to establish that *any* prejudice existed against him, a change of venue would still not have been warranted unless he could demonstrate that the "prejudice against him [was] so great that he [could not] get a fair trial." *Gangwer*, 169 W.Va. at 177, 286 S.E.2d at 391, syl. pt. 1, in part. Jury voir dire simply did not demonstrate the prejudice about which the petitioner speculated.

"Whether a change of venue is warranted rests in the sound discretion of the trial court, and its ruling thereon will not be disturbed, unless it clearly appears that such discretion has been abused." *Gangwer*, 169 W.Va. at 177, 286 S.E.2d at 391, syl. pt. 2. Based on the record before us, we find no abuse of discretion in the trial court's decision that a change of venue was not warranted in this matter.

### D. Jail attire

The petitioner asserts the trial court deprived him of his constitutional right to a presumption of innocence by compelling him to wear orange jail attire and to be restrained in handcuffs and leg shackles in the presence of the jury during voir dire. Relying upon *Estelle v. Williams*, 425 U.S. 501 (1976), the petitioner asserts that courts cannot compel defendants to stand trial while dressed in "identifiable prison clothes . . . ." *Id.* at 512. The

petitioner contends the trial court erred by failing to permit him to be absent from jury selection after he refused to wear the street attire that was provided to him.

While agreeing that a criminal defendant has a fundamental right not to be forced to attend trial in identifiable prison attire, the State asserts that a criminal defendant may waive a fundamental right protected by the Constitution, so long as the right was knowingly and willingly waived. Maintaining that the petitioner's repeated threats and statements throughout pre-trial hearings suffice this standard, the State recounts the efforts made by the trial judge and the petitioner's counsel to have the petitioner to change into the street attire provided to him. Because the petitioner refused to do so, the State asserts the petitioner waived his right not to appear during voir dire in orange jail attire. We agree.

There is no question that "[a] criminal defendant has the right under the Due Process Clause of our State and Federal Constitutions not to be forced to trial in identifiable prison attire." Syl. Pt. 2, in part, *State ex rel. McMannis v. Mohn*, 163 W.Va. 129, 254 S.E.2d 805 (1979). Further, "'[a] criminal defendant has the right, absent some necessity relating to courtroom security or order, to be tried free of physical restraints." Syl. Pt. 3, *State v. Brewster*, 164 W.Va. 173, 261 S.E.2d 77 (1979). In addressing this issue of constitutional dimension, our review is plenary. *See State v. Finley*, 219 W.Va. 747, 749, 639 S.E.2d 839, 841 (2006) (addressing issue of defendant appearing at trial in jail attire and finding that "[t]he issue . . . calls on us to examine a question of constitutional dimension and as such, '[w]here

32

the issue on an appeal from the circuit court is clearly a question of law . . . we apply a *de novo* standard of review.'  Syl. Pt. 1, in part, *Chrystal R.M. v. Charlie A.L.*, 194 W.Va. 138, 459 S.E.2d 415 (1995).").

As indicated above, the record is replete with the petitioner's threats to his counsel, his counsel's families, witnesses, and courtroom security; his insulting language directed to the trial judge; his disruptive behavior; and finally his trial counsel's stated belief that the petitioner was going "to try to create some chaos" in the courtroom during jury voir dire.  The record indisputably demonstrates that the trial court went to great lengths to protect the petitioner's constitutional rights, while also assuring courtroom security, by offering and making available passive restraints to be worn under the street clothes.[36]  The petitioner's flat out refusal to change into the street clothing and passive restraints prompted the trial judge to find that "[t]he Court is left with no choice but to have him [the petitioner] brought to the courtroom in his jail clothing with shackles and handcuffs."

It is abundantly clear that every effort was made by the trial judge and defense counsel to have the petitioner change into the street attire and the humane restraints. The petitioner's blatant refusal to do so leads us to the ineluctable conclusion that the petitioner knowingly and intelligently waived his right not to wear jail attire.  *See State v. Eden*, 163

---

[36]The parties represent that the petitioner appeared throughout the remainder of his trial in street clothing.

33

W.Va. 370, 378, 256 S.E.2d 868, 873 (1979) ("An accused may, by declaration and conduct, waive a fundamental right protected by the Constitution, but it must be demonstrated that the waiver was made knowingly and intelligently."). Moreover, we find no merit in the petitioner's contention that he should have been absented from jury voir dire due to his refusal to change into street clothing. Critically, the petitioner never asked to be absent from voir dire. Had the trial court, sua sponte, refused to allow the petitioner to be in the courtroom in jail attire during voir dire, the trial court would have denied the petitioner his constitutional right to be present at a critical stage of his criminal proceedings. *See* Syl. Pt. 6, *State v. Boyd*, 160 W.Va. 234, 233 S.E.2d 710 (1977) ("The defendant has a right under Article III, Section 14 of the *West Virginia Constitution* to be present at all critical stages in the criminal proceeding; and when he is not, the State is required to prove beyond a reasonable doubt that what transpired in his absence was harmless."); *see also* W.Va. R.Crim. P. 43(a) ("The defendant shall be present . . . at every state of the trial . . . ."). For these reasons, we find no error in this regard.[37]

---

[37]The petitioner also asserts that the cumulative effect of the errors he has alleged deprived him of his constitutional right to a fair trial and warrants a reversal of his convictions. *See* Syl. Pt. 5, *State v. Smith*, 156 W.Va. 385, 193 S.E.2d 550 (1972) ("Where the record of a criminal trial shows that the cumulative effect of numerous errors committed during the trial prevented the defendant from receiving a fair trial, his conviction should be set aside, even though any one of such errors standing alone would be harmless error."). Having failed to demonstrate any error in the proceedings below, there is no basis to invoke the cumulative error doctrine.

## IV. Conclusion

For the reasons stated above, the petitioner's conviction for first degree murder and conspiracy to commit burglary are hereby affirmed.

Affirmed.